MONSANTO COMPANY Plaintiff

v.

Mitchell SCRUGGS, Eddie Scruggs,
and Scruggs Family Farm
Supply Defendants

No. 3:00–CV–161–P–A.

United States District Court,
N.D. Mississippi,
Western Division.

June 30, 2004.

Michael Noel Watts, Robert Bradley Best, Holcomb Dunbar, Oxford, MS, Frank S. Thackston, Jr., Lake Tindall, LLP, Charles Victor McTeer, Kimberly Georgette Jones, McTeer & Associates, Greenville, MS, Joseph C. Orlet, Matthew T. Schelp, Erik L. Hansell, Matthew R. Grant, Glennon P. Fogarty, Dutro E. Campbell, Michele L. Taylor, S. Christian Mullgardt, II, Adam E. Miller, Husch & Eppenberger, LLC, Stephen G. Strauss, Dale R. Joerling, Thompson Coburn, St. Louis, MO, Kenneth A. Letzler, Jonathan I. Gleklen, Michael D. Yeh, Arnold & Porter, Washington, DC, Susan K. Knoll, Howrey Simon Arnold & White, Houston, TX, for plaintiff.

Jim D. Waide, III, Waide & Associates, PA, Lisa Scruggs Rohman, Lisa Scruggs Rohman, Attorney, Tupelo, MS, James L. Robertson, Wise, Carter, Child & Caraway, Dennis C. Sweet, III, Sweet & Freese, Jackson, MS, Gary Myers, University Of Mississippi—Office Of University Attorney, University, MS, for defendants.

## MEMORANDUM OPINION

PEPPER, District Judge.

This cause is before the Court on Monsanto's Motion for Summary Judgment on Counts Six, Seven, Eight and Nine of Defendants' Counterclaim (Defendants' Antitrust Claims) [401–1]. The Court, having reviewed the motion, the response, the briefs of the parties, the authorities cited and being otherwise fully advised in the premises, finds as follows, to-wit:

## FACTUAL BACKGROUND

In the mid–1990's, Monsanto launched revolutionary new agricultural technologies. The new technologies have been described ad infinitum in other Memorandum Opinions issuing from the Court, as have the defendants' unauthorized use and replication of seed containing Monsanto's patented biotechnology. When Monsanto sued them for patent infringement, the Scruggses categorically denied liability for their conduct and turned the tables on Monsanto by alleging that Monsanto's commercial practices not only violated federal and state antitrust laws, but also constituted patent misuse. The allegations, if proven true, are an absolute defense to Monsanto's infringement action.

The defendants target the gamut of Monsanto's marketing strategies as they pertain to Roundup Ready and Bollgard traits, Roundup Ready and Bollgard seed and the entire line of Roundup herbicide products. Very broadly broken down, the principal foci of the Scruggses' attack are Monsanto's agreements with its seed partners, Monsanto's agreements with seed and herbicide dealers and Monsanto's dealings with individual growers. They contend Monsanto imposed restrictive terms at each level of the market for its technologies and that those restrictive terms amounted to unlawful restraints on trade. That same conduct, they argue, enabled Monsanto to extend its monopoly power in the markets for traits, seed and glyphosate herbicide.

After ample opportunity for discovery, Monsanto filed its Motion for Summary Judgment. The motion seeks dismissal of the defendants' federal and state antitrust claims as denominated in Counts Six, Seven and Nine. The motion also seeks judgment as a matter of law on the Scruggses' affirmative defense of patent misuse as denominated in Count Eight. The motion has been fully briefed and the Court is ready to rule.

## STANDARD OF REVIEW

■ Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. *John v. State of La. (Bd. Of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir.1985).

■ A judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir.1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will

preclude summary judgment." *Phillips Oil Company, v. OKC Corporation,* 812 F.2d 265, 272 (5th Cir.1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, ... all other contested issues of fact are rendered immaterial." *See Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. *Topalian v. Ehrman,* 954 F.2d 1125, 1138 (5th Cir.1992).

■ In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin,* 736 F.2d 175, 178 (5th Cir.1984).

■ The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. *Union Planters Nat. Leasing v. Woods,* 687 F.2d 117 (5th Cir.1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalian,* 954 F.2d at 1131.

■ "Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John,* 757 F.2d at 708. "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion. *Id.* at 709.

■ However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.,* 584 F.2d 111, 114 (5th Cir.1978). In

other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Re Municipal Bond Reporting Antitrust Lit.,* 672 F.2d 436, 440 (5th Cir.1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed.R.Civ.P. *See also Union Planters Nat. Leasing v. Woods,* 687 F.2d at 119.

■ While generally "[t]he burden to discover a genuine issue of fact is not on [the] court, (*Topalian,* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention—the court must consider both before granting a summary judgment.'" *John,* 757 F.2d at 712, *quoting Keiser v. Coliseum Properties, Inc.,* 614 F.2d 406, 410 (5th Cir.1980).

## LEGAL ANALYSIS

### Antitrust Counterclaims

Monsanto's motion launches a two-pronged attack on the Scruggses' antitrust claims. In the first instance, they allege the defendants lack standing to bring their federal antitrust claims. In the second, they urge the defendants' claims fail on their merits. The Court will address each of these arguments in turn.

### I. Federal Antitrust Claims

#### A. Standing Inquiry

The defendants' counterclaim seeks both damages and injunctive relief under the federal antitrust laws. At oral argument, counsel for Monsanto conceded defen-

dants' standing to seek injunctive relief under § 16 of the Clayton Act. 15 U.S.C. § 26. Monsanto's motion attacks only the defendants' standing to bring a private damages action under § 4 of the Clayton Act. 15 U.S.C. § 15. In light of the Court's decision on the merits of the antitrust counterclaims, *infra,* it is unnecessary to address Monsanto's standing argument.

### B. Merits Inquiry

### 1. Conduct Falling Within the Patent Grant

■ This case implicates the peculiar intersection between the public interest in rewarding and encouraging innovation protected by the patent laws and the public interest in safeguarding competition protected by the antitrust laws. On the one hand, "[i]ntellectual property rights do not confer a privilege to violate the antitrust laws." *In re Indep. Serv. Orgs. Antitrust Litig.,* 203 F.3d 1322, 1325 (Fed.Cir.2000). On the other, "conduct permissible under the patent laws cannot trigger any liability under the antitrust laws." *SCM Corp. v. Xerox Corp.,* 645 F.2d 1195, 1206 (2d Cir. 1981). "The patent laws ... are in pari materia with the antitrust laws and modify them pro tanto." *Simpson v. Union Oil Co. of Cal.,* 377 U.S. 13, 24, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). On balance, a patent holder may be held accountable under the antitrust laws only if its conduct falls outside the ambit of protection afforded by the patent laws. *U.S. v. Line Material Co.,* 333 U.S. 287, 308, 68 S.Ct. 550, 92 L.Ed. 701 (1948). Two questions are paramount. What conduct do the Scruggses condemn as anticompetitive? Is that conduct protected under the patent laws?

Since introducing its biotechnology in 1996, Monsanto has always imposed certain requirements on growers through licensing provisions in its contracts with seed partners and individual farmers. The agreements have always: a) required growers to only use seed containing Monsanto's biotechnology for planting a single crop; b) prohibited transfer or re-use of seed containing the biotechnology for replanting; and c) required payment of a royalty fee. Exhibits A and B to Monsanto's Motion for Summary Judgment.

■ Monsanto's no replant policy and its decision to charge growers a uniform technology fee are among the many practices the Scruggses target as anti-competitive. Monsanto urges its licensing provisions are a valid exercise of its rights under the patent laws. With regard to the ban on seed saving, Monsanto characterizes the restriction as nothing more than a limited use license, a practice permitted under the patent laws. *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 703 (Fed. Cir.1992). This Court adopted that position in ruling on Monsanto's motion for a preliminary injunction, *Monsanto Co. v. Scruggs,* 249 F.Supp.2d 746, 754 (N.D.Miss.2001). In the interim since that decision, the Federal Circuit Court of Appeals considered the identical no replant policy and held that "the restrictions in the Technology Agreement prohibiting the replanting of the second generation of ROUNDUP READY® soybeans do not extend Monsanto's rights under the patent statute." *Monsanto Co. v. McFarling,* 363 F.3d 1336, 1343 (Fed.Cir.2004). Accordingly, Monsanto's no replant policy is not subject to challenge under the antitrust laws.

■ With respect to Monsanto's imposition of uniform technology fees on all growers, the defendants contend Monsanto's practice is merely a guise for an illegal price fixing scheme. Monsanto urges its technology fees are simply royalties and that the patent laws permit it to charge any royalty it chooses. *Brulotte v. Thys Co.,* 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d

99 (1964). Monsanto's position is correct. The patent laws permit a patentee to "exact royalties as high as he can negotiate with the leverage of that [patent] monopoly." *Id.* at 33, 85 S.Ct. 176. Because its collection of a uniform technology fee is within the scope of the patent grant, Monsanto cannot be liable for a violation of the antitrust laws.

 Defendants also attack Monsanto's refusal to license its soybean seed partners to stack the Roundup Ready trait with transgenic traits developed by Monsanto's competitors, as well as the provision expressly limiting the license grant by forbidding its seed partners from "engaging in any research or experimentation with 'Monsanto Know–How And Biological Material' or 'Licensed Patent Rights.'" Defendants' Memorandum at p. 17. The Court declines the defendants' invitation to scrutinize these restrictions; they are clearly field of use restrictions which fall within the scope of the patent monopoly and are, therefore, lawful. *B. Braun Medical, Inc. v. Abbott Laboratories,* 124 F.3d 1419, 1426 (Fed.Cir.1997).

### 2. Sherman Act § 1 Claims

 The Scruggses challenge numerous other aspects of Monsanto's business conduct as violative of § 1 of the Sherman Act. Section 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Recovery for a violation of § 1 requires proof of 1) a contract, combination or conspiracy 2) affecting interstate commerce 3) which imposes an unreasonable restraint of trade. *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1158 (5th Cir.1992).

The analytical approach to a § 1 claim differs depending on the nature of the challenged conduct. "Certain arrangements are conclusively presumed to be unreasonable restraints of trade, simply by virtue of their obvious and necessary effect on competition." *E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178, 186 (5th Cir. 1972). Conduct of this type is per se illegal. All other activities are subject to more laborious scrutiny under what is known as the rule of reason. Defendants urge a right to recover for violations of § 1 under both analytical models.[1] The Court will address each claim in turn.

### a. Per Se Analysis

 "A tying arrangement is the sale or lease of one product on the condition that the buyer or lessee purchase a second product." *Breaux Bros. Farms, Inc. v. Teche Sugar Co., Inc.,* 21 F.3d 83, 86 (5th Cir.1994). The desired product is called the 'tying' product; the other is the 'tied' product. *United Farmers Agents Ass'n. Inc. v. Farmers Ins. Exch.,* 89 F.3d 233, 236 n. 2 (5th Cir.1996) (citing 9 Phillip E. Areeda, *Antitrust Law* ¶ 1700a (1991)). The essence of a tying claim is forcing. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 13, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). To prove a per se tying claim, a plaintiff must show: 1) the involvement of two separate products or services; 2) the sale of one product or service is conditioned on the purchase of another; 3) the seller has sufficient economic power in the market for the tying product; and 4) an effect on a not insubstantial amount of interstate commerce in the tied product. *Eastman Kodak Co. v. Image Tech. Ser-*

---

**1.** Still other conduct may fall into a hybrid category known as a "quick look" § 1 case. Other than Monsanto's no replant policy already addressed *supra,* defendants do not contend that any of Monsanto's conduct fails the "quick look" test.

*vices, Inc.,* 504 U.S. 451, 461–62, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

Defendants allege Monsanto engaged in illegal tying on four fronts.[2] They claim Monsanto tied the purchase of seed to the purchase of Roundup through its grower license agreements and grower incentive agreements, as well as its seed partner agreements. As a further matter, the Scruggses argue that Monsanto illegally tied Roundup and Bollgard traits in cotton seed.

### i. Monsanto's Grower License Agreements

■ Defendants contend the grower license agreements utilized by Monsanto from 1996 to 1998 employed a blatant tie between seed containing Monsanto's patented Roundup Ready trait and Roundup herbicide. The pertinent portion of the 1996 technology agreement reads:

> The Grower further agrees that if the Grower uses any glyphosate ... containing herbicide in connection with the soybean crop produced from this seed, the herbicide will be a ROUNDUP® BRANDED HERBICIDE (or other Monsanto authorized glyphosate-containing herbicide) labeled for use on ROUNDUP READY® soybeans. No other glyphosate containing herbicide

may be used with this patent-protected seed.

Exhibit A to Monsanto's Motion for Summary Judgment. The 1997 and 1998 agreements provided: "If a herbicide containing the same active ingredient as Roundup Ultra herbicide (or one with a similar mode of action) is used over the top of Roundup Ready crops, you agree to use only Roundup branded herbicide." Exhibit 2 to Scruggses' Supplemental Submission in Opposition to Monsanto's Motion for Summary Judgment.

Defendants contend the above-quoted language coerced growers into using Monsanto's Roundup line of herbicides when they may have preferred other brands of glyphosate-based herbicide. Monsanto contends, first and foremost, that nothing in the grower license agreements compelled farmers to purchase Roundup. Growers could choose not to use any herbicide "over-the-top" of Roundup Ready crops. They could also choose to use any non-glyphosate herbicide "over-the-top" of Roundup Ready crops. With regard to its prohibition on glyphosate-based herbicides other than Roundup, Monsanto avers that the restriction was necessary to assure compliance with the mandates of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA). 7 U.S.C. § 136 et seq. FIFRA prohibits the use of any herbicide

---

**2.** Defendants also alleged that Monsanto's no replant policy creates a de facto tie between traits and germ plasm; however, the Federal Circuit considered precisely the same argument in *McFarling* and found it insufficient as a matter of law:

> We need not plumb the complexities of tying ..., however, to determine that the district court correctly granted summary judgment for Monsanto. McFarling does not raise a typical tying allegation, and the mere recitation of the word "tying" is not sufficient....
>
> McFarling's "tying" argument instead centers on his desire to replant the entire seed, including the genetic modifications,

and on Monsanto's refusal to grant him permission to do so.... At its simplest, McFarling effectively argues ... that he should be granted a compulsory license to use the patent rights in conjunction with the second-generation ROUNDUP READY® soybeans in his possession after harvest. We decline to hold that Monsanto's raw exercise of its right to exclude from the patented invention by itself is a "tying arrangement"....

*McFarling,* 363 F.3d at 1342. The defendants also claimed that Monsanto tied the use of its traits to the purchase of seed in subsequent years. This, too, is an attack on Monsanto's no replant policy. It likewise fails.

in a manner inconsistent with its labeling. 7 U.S.C. § 136j(2)(G). Because Roundup was the only product labeled for use "over-the-top" of Roundup Ready crops between 1996 and 1998, it was the only EPA-approved herbicide that *could* be used on Roundup Ready crops during that period. Beginning in 1999, Monsanto's license agreements and/or technology use guides authorized the use of any competing glyphosate herbicide which met EPA labeling requirements for "over-the-top" use as a permissible alternative to Roundup.

Defendants contend in their supplemental submission that the language in the 1996 technology license prohibits *any* use of non-Roundup glyphosate herbicide, not just "over-the-top" use. Read in isolation, defendants' interpretation might be reasonable. However, defendants' own submissions belie that interpretation. Defendants' Exhibit 59 also relates to the 1996 licensing restriction. It reads: "The Grower will use only Roundup branded herbicide if a herbicide containing glyphosate or any other EPSP synthase inhibitor is used *over the top* of Roundup Ready soybeans." Exhibit 59 to Defendant's Opposition to Monsanto's Motion for Summary Judgment (emphasis added). Defendants tout the fact that competing herbicides Glyfos and Touchdown were approved for certain uses with soybean crops as early as 1996, but they cannot disavow the fact that neither herbicide met the EPA labeling requirements for "over-the-top" use during the 1996 growing season. Nor is there any evidence before the Court from which a reasonable trier of fact could conclude that Monsanto's license agreement prohibited the application of competing glyphosate products for burndown or as a mere harvest aid. Based on the record before the Court, defendants have failed to meet their burden of producing significant probative evidence that Monsanto forced farmers who wanted to purchase Roundup Ready seeds to purchase Roundup as well.[3]

ii. Monsanto's Grower Incentive Programs

The Scruggses also find fault with the Roundup Rewards program Monsanto offers to farmers. They assert that this program too constitutes an illegal tying scheme between Roundup Ready seed and Roundup herbicide. This claim is easily disposed of. Defendants cannot demonstrate the coercion necessary to a tie-in. Growers who participate in the incentive program receive additional, voluntary benefits if they elect Roundup agricultural herbicides as the only systemic, non-selective herbicide to be used for burndown or in-crop applications on crops containing Monsanto traits. The program is entirely

---

**3.** The same is true with regard to the defendants' challenge to Monsanto's grower license agreements since 1999. The Court categorically rejects the assertion that Monsanto's failure to list all approved non-Roundup glyphosate herbicides in the technology agreement causes consumer confusion and unduly bolsters Monsanto's branded products. The agreement provides: "Grower [a]grees ... [t]o use on Roundup Ready crops only a Roundup® agricultural herbicide or other authorized non-selective herbicide which could not be used in the absence of the Roundup Ready gene (see TUG [Technology Use Guide] for details on authorized non-selective prod-

ucts)." The language used communicates that glyphosate-based herbicides other than Roundup may be used with Roundup Ready crops and that additional information about alternative glyphosate-based herbicides may be obtained from the TUG. The 2003 TUG provides: "You may use another glyphosate herbicide, but only if it has been approved for use over Roundup Ready crops, and it has been labeled for this use by all required governmental agencies." The farmer need only consult the label of any competing glyphosate product to determine whether the product is suitable for use over-the-top of Roundup Ready crops.

optional; customers who participate do so because they benefit from the incentives, not because Monsanto compels them to do so. Since the sale of Roundup Ready seed is not conditioned upon the purchase of Roundup herbicide, there is no tying arrangement. "It is only when the buyer's freedom to choose a given product is restricted that the tying doctrine comes into play: so long as the 'buyer is free to take either product by itself there is no tying problem.'" *Ungar v. Dunkin' Donuts of Amer., Inc.*, 531 F.2d 1211, 1226 (3d Cir. 1976) (quoting *N. Pac. Ry. v. United States*, 356 U.S. 1, 6 n. 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)).

### iii. Monsanto's Seed Partner Agreements [4]

■ Defendants also attack the terms of Monsanto's agreements with its seed partners. They contend Monsanto conditions the extension of licenses to its seed partners on an agreement to use Roundup herbicide. Among the Scruggses' exhibits are numerous copies of licensing agreements with various seed partners. An excerpt from Monsanto's contract with Griffith Seed Company is representative:

> 3.10 If **GRIFFITH**, directly or indirectly, used any **GLYPHOSATE** containing herbicide or any other EPSP synthase inhibitor herbicide in connection with the **SOYBEAN** crop produced from **LICENSED COMMERCIAL SEED**, the herbicide shall be a **ROUNDUP®** **HERBICIDE** labeled for use on **ROUNDUP READY SOYBEANS**. No other **GLYPHOSATE** or other EPSP synthase

inhibitor herbicide may be used with the patent-protected seed. This provision shall not limit the use of herbicides other than **GLYPHOSATE** on such **SOYBEAN** germplasm.

Exhibit 16 to Defendants' Supplemental Submission in Opposition to Monsanto's Motion for Summary Judgment at p. 2.

Defendants fall short of demonstrating that Monsanto forces its seed partners to buy Roundup herbicide in order to obtain a desired license. Although the provision at issue forecloses seed partners from using glyphosate-based herbicides other than Roundup, Monsanto's seed partners are under no compulsion to buy Roundup. The seed partners may refrain from using any glyphosate-based herbicide. They are likewise free to use any non-glyphosate herbicide they choose.

Furthermore, the nature of the business relationship between Monsanto and its seed partners provides an additional basis for a refusal to extend per se treatment to any alleged tie. The contract expressly provides that the parties seek "arrangements under which **MONSANTO** would license soybean growers the right to use **LICENSED COMMERCIAL SEED** exhibiting such resistance to **ROUNDUP®** **HERBICIDE** ... and **GRIFFITH** (or its dealers or distributors) would produce and sell **LICENSED COMMERCIAL SEED** to soybean growers." Exhibit 16 at p. 1. All of the seed produced pursuant to the agreement bears Monsanto's Roundup Ready trademark—in essence warranting the product's suitability for use with Roundup. Accordingly, Monsanto has a

---

**4.** The Court doubts defendants' standing to challenge this aspect of Monsanto's seed partner agreements. A party who seeks injunctive relief under the antitrust laws must demonstrate some threatened loss or damage to his own interests. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Defendants have made no showing that they are in a position to market competing glyphosate-based herbicides to any of Monsanto's seed partners, and the Court cannot conceive of any other harm which might inure to defendants form the complained of provisions.

vested interest in ensuring that seed so marketed is, indeed, tolerant to Roundup. The tie, if there be a tie, is not appropriate for per se treatment.

### iv. Monsanto's Stacked Trait Cotton

■ Defendants also raise a tying claim in relation to stacked trait cotton. The Scruggses allege that Monsanto tied the sale of cotton containing the Roundup Ready trait to cotton containing the Bt trait. No lengthy analysis is necessary to dispose of this claim.

Nothing in the record remotely suggests that growers who wanted to purchase Roundup Ready cotton seed also had to purchase Bollgard seed. Instead, the defendants complain that Monsanto required its seed partners to focus on stacked trait cotton (seed containing both the Roundup Ready and Bollgard traits) to the exclusion of single trait seed, e.g., cotton seed containing only the Roundup Ready gene. There are numerous problems with defendants' argument. In the first instance, it is unlikely that defendants can demonstrate the requisite tie between two products—as opposed to a bundling of desirable traits into a single product offered to the consumer.

But beyond that, the record does not support the defendants' claim that Monsanto engineered a shortage of single trait cotton seed which "forced" growers to buy stacked trait seed when they would have preferred to purchase single trait Roundup Ready seed. Monsanto offered the affidavits of Don Threet and Randy Deaton to dispel the defendants' assertions in that regard. Exhibits C and K in Opposition to Defendants' Motion to Reconsider Preliminary Injunction. Mr. Threet, Vice President of U.S. Business of Emergent Genetics US, Inc. (formerly Stoneville Pedigreed Seed Company), testified that his company began offering single trait Roundup Ready cottonseed in 2001 and the number of cotton lines containing the Roundup Ready trait alone has steadily increased since that time. He further testified that his company has no awareness of a "shortage" of cottonseed containing only the Roundup Ready trait; Emergent knows there is a demand for single trait cottonseed and the company plans to continue offering single trait Roundup Ready seed so long as that demand continues. Mr. Deaton, Director of Monsanto's Global Cotton Business, testified to the meaning of the allegedly nefarious 75% provision in the Research Agreement between Monsanto and Delta & Pine Land Company (DPL). His testimony absolutely lays waste to the defendants' argument that the agreement forces DPL to incorporate Monsanto's Bollgard and Roundup Ready traits in three quarters of all cotton produced—allegedly restricting the output of both conventional and single trait Roundup Ready seed. Instead, the provision merely requires that DPL include Monsanto's stacked traits in at least 75% of new cotton lines offered in a given year. "The purpose of this provision [is] to ensure that DPL gives growers the option of purchasing its newest cottonseed lines in the stacked trait version." [5] Exhibit K to Monsanto's Opposition to Motion to Reconsider Preliminary Injunction. Defendants offered no contrary evidence to refute the testimony of either gentle-

---

**5.** Deaton's affidavit also declares:
This provision does not mean that 75% of all new *varieties* of cottonseed sold by DPL must contain the stacked trait gene by 2003. For example, DPL is free to offer the same new line of cottonseed in several versions, each of which is called a separate variety—conventional, Roundup Ready® only, Roundup Ready®/Bollgard® stacked trait, or Bollgard® only—and still be in compliance with this agreement. Moreover, this provision contains no limitation on the quantity of seed without the stacked trait that DPL may sell.
Exhibit K at p. 2.

man; accordingly, their claim that Monsanto illegally "tied" its Roundup Ready trait to its Bollgard trait fails.

### b. Rule of Reason

Simply put, defendants argue Monsanto implemented a seed cartel through its vast web of contractual agreements with seed partners (of which there are close to three hundred). By means of the cartel, Monsanto and its seed partners control the markets for cottonseed and soybean seed, thereby enabling Monsanto and its seed partners to charge supra-competitive prices for seed. Other than the practices identified above,[6] defendants specifically attack Monsanto's "any third party" clause, which binds distributors and dealers in the downstream markets to the same restrictions Monsanto imposes on its seed partners. Defendants also target aspects of Monsanto's financial incentive program with its seed partners, dealers and distributors; they contend the incentives effectively shield Monsanto from competition in the markets for traits, seed and glyphosate.

When conducting a rule of reason analysis, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). In the event the defendants bring forward evidence that Monsanto's actions unreasonably restrained trade, the inquiry devolves to a balancing act: "The court must then balance the anticompetitive evils of a restrictive practice ... against any procompetitive benefits or justifications within the confines of the relevant market. Proof that the defendant's activities, on balance, adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of reason." *Apani Southwest, Inc. v. Coca–Cola Enterprises, Inc.*, 300 F.3d 620, 627 (5th Cir. 2002) (quoting from *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d 301, 307 (5th Cir.1997)).

■ Having reviewed the "any third party" clause in its context, the Court concludes that it cannot reasonably be construed as an unreasonable restraint on trade. The clause simply reiterates the limited nature of the seed partners' license, limits which this Court found valid in section I.B.1.

■ Likewise, Monsanto's seed partner agreements do not, contrary to defendants' assertions, *require* that its soybean licensees "exceed ninety percent (90%) of aggregate Herbicide–Resistant Soybean Products sold...." Defendants' experts stop short of characterizing Monsanto's financial incentive program with its seed partners as exclusive dealing arrangements—and with good reason. Monsanto does not require its seed partners to incorporate Monsanto traits in a certain percentage of all commercial seed sold. The provision is merely a financial incentive offered by Monsanto—in the event they do reach target sales levels, the seed partners receive a discount on applicable technology fees. However, seed partners are under no compulsion to reach a minimum sales level. The financial incentive agreements

---

**6.** The Court concludes that defendants' evidence of the "tying" practices manifestly fails to demonstrate an unreasonable restraint on trade. Furthermore, to the extent that the "tying" practices might, under a tortured interpretation, be considered undue restraints, the pro-competitive justifications offered by Monsanto offset any adverse effects on competition—real or potential.

do not foreclose competition in a substantial share of the relevant product market(s). The same analysis applies to the Scruggses' financial incentive programs with its dealers and distributors. The defendants' § 1 rule of reason claims fail.[7]

### 3. Sherman Act § 2 Claims

■ Next, the defendants repackage much of the previously complained of conduct and assert it as violative of § 2 of the Sherman Act. Section 2 proscribes unlawful monopolization and attempted monopolization. 15 U.S.C. § 2. In order to prevail on their § 2 claim, defendants must prove Monsanto possessed monopoly power in a relevant market; and Monsanto acquired or maintained that power wilfully (by means of anti-competitive practices) instead of competition on the merits. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

■ As a prerequisite to recovery, the Scruggses must first prove (define) the relevant market(s). *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir.1997). Cross-elasticity of demand, whereby a rise in price for a good within a relevant product market tends to create a greater demand for other like goods in that market, is the focal inquiry in determining what products make up the relevant market. *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 400, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Products need not be perfect substitutes to be included in the relevant market: "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, ei-

ther would work effectively." *Queen City Pizza*, 124 F.3d at 437.

■ After defining the relevant market, defendants must then prove Monsanto wields monopoly power in the relevant market. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Monopoly power is defined as "the power to control prices or exclude competition." *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 201 (3d Cir.1992), *cert. denied*, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). Although several factors determine whether a firm possesses monopoly power in a relevant market, one of the most crucial is a firm's market share. *U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 999 (11th Cir. 1993), *cert. denied*, 512 U.S. 1221, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994); *Pennsylvania Dental Assoc. v. Medical Serv. Assoc. of Penn.*, 745 F.2d 248, 260 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985).

Finally, defendants must show the willful acquisition or maintenance of alleged monopoly power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident in the relevant market." *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. 1698.

Monsanto asserts the Scruggses cannot produce sufficient proof on any of these points to withstand summary judgment. In the first instance, the relevant markets proposed by the defendants' experts conflict with those pleaded in the Scruggses' counterclaim. In the second instance, the experts' proposed product markets conflict with one another. Beyond that, Monsanto asserts, the defendants cannot show Monsanto possesses monopoly power or that it

---

**7.** Defendants also raise a § 1 conspiracy claim in their Counterclaim. It suffers from the same evidentiary deficiencies as the Scruggses' other § 1 claims. There being no genuine issue of material fact, Monsanto is entitled to summary judgment on the conspiracy claim as well.

engaged in any anti-competitive conduct. The Court agrees with Monsanto on every point.

### a. Failure to Define the Relevant Product Markets

■ In the first instance, the Scruggses' experts offer testimony which markedly contradicts the product markets alleged in the defendants' Counterclaim. The defendants' own pleadings state that the relevant markets are:

1. The United States markets for Roundup Ready cotton seed and Roundup Ready soybean seeds;

2. The United States markets for Roundup Ready cotton technology and Roundup Ready soybean technology and/or the relevant regional or geographically smaller submarkets within the United States; and

3. The United States and/or the relevant regional submarket for all cotton seed and soybean seeds.[8]

In marked contrast, defendants' various economic experts proffer at least six different market definitions. And those market definitions conflict with one another. Nothing in the record indicates the defendants ever sought leave to amend their pleadings to alter their proposed market definitions; the Court refuses to countenance defendants' failure to do so by permitting proof of product markets other than those pleaded in their Counterclaim. Defendants are "saddled with their [Counterclaim] as filed in this Court." *Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1482 n. 19 (10th Cir. 1995). And, in a similar vein, the conflict in the experts' proposed market definitions is fatal as well: "[T]he fact that [defendant] has offered two experts who endorse

... different market definitions seriously compromises [defendant's] claim to have defined any relevant markets at all." *Bepco, Inc. v. Allied–Signal, Inc.*, 106 F.Supp.2d 814, 824 (M.D.N.C.2000).

### b. Failure to Demonstrate Monopoly Power

### i. Market for Roundup Ready Technology

■ One of the proposed markets alleged in defendants' counterclaim is the market for Roundup Ready technology. This claim fails as a matter of law because the proposed market definition cannot state an antitrust claim. Monsanto holds patents on Roundup Ready cotton and soybean technology. "[A] patent is an exception to the general rule against monopolies and the right to access to a free and open market." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Consequently, a patentee cannot be held liable under the antitrust laws for the natural monopoly afforded under the Patent Act. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir.1984) (refusing to define market in terms of defendant's own product). *See also TV Communications Network, Inc. v. Turner Network Television*, 964 F.2d 1022, 1025 (10th Cir. 1992) (dismissing complaint for failure to allege a relevant market over which TNT was capable of exercising a monopoly in violation of the antitrust laws). Defendants cannot prevail on their claim that Monsanto monopolized and/or attempted to monopolize the markets for Roundup Ready soybean and cotton technology.

---

8. Defendants alleged a fourth relevant market: the United States market and/or the relevant regional submarket for glyphosate herbicide. Monsanto does not fault with this proposed market definition. The Scruggses' claims that Monsanto monopolized and/or attempted to monopolize the glyphosate market are addressed *infra*.

#### ii. Markets for Soybean Seed and Cottonseed

 The other markets proposed by defendants are the markets for Roundup Ready soybean seed and cotton seed and the overall markets for cotton and soybean seed. The defendants' evidence is insufficient to show a triable issue of fact as to Monsanto's possession of monopoly power in the proposed markets. As noted *supra,* monopoly power is the power to *control* prices and exclude competition. Defendants' experts never take that leap. Instead, Ian Ayers avers that Monsanto "affects" the price of soybeans and cotton. This is simply insufficient. Furthermore, Dr. Ayers' conclusion rests on a flawed basis. He, and the defendants' other experts, all assume the propriety of including the market shares of Monsanto's seed partners in determining Monsanto's share of the relevant market. No legal precedent supports such a remarkable position. Monsanto's market share must be determined solely on the quantity of goods and/or services Monsanto sold to consumers. *Anchor,* 7 F.3d at 999. At best, only the market shares of Monsanto's wholly owned subsidiaries are to be included. *Grinnell,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778. After excluding Monsanto's seed partners, Monsanto possesses only a 25.6% market share in the United States market for soybean seeds and a 0% share in the market for cotton seeds. Such market shares are insufficient to support a § 2 claim as a matter of law. *Jefferson Parish,* 466 U.S. at 26–27, 104 S.Ct. 1551. Accordingly, no reasonable trier of fact could conclude Monsanto possesses monopoly power in the proposed markets for cotton and soybean seed.[9]

#### c. Failure to Demonstrate Anti–Competitive Conduct in Glyphosate Market

 The Scruggses rely solely on the evidence discussed in relation to defendants' § 1 claim to support their claim that Monsanto monopolized or attempted to monopolize the glyphosate market. To prevail on their claim, defendants must be able to demonstrate that Monsanto engaged in "behavior that not only 1) tends to impair opportunities of rivals, but also 2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing,* 472 U.S. at 605 n. 32, 105 S.Ct. 2847 (quoting 3 P. Areeda & D. Turner, *Antitrust Law* 78 (1978)). The same rule of reason analysis applies to a monopolization claim as an unreasonable restraint of trade claim. Having concluded that none of Monsanto's conduct, e.g., its grower license agreements, grower incentive programs and its dealer incentives, could reasonably be considered anti-competitive, no further discussion is necessary. Monsanto is entitled to summary judgment on the defendants' glyphosate monopolization claim.[10]

### II. State Law Antitrust Claims

 Defendants also seek recovery under Miss.Code Annotated § 75–21–1, et seq., for violations of Mississippi's antitrust laws. Just as Monsanto is entitled to judgment as a matter of law on defendants' federal antitrust claims, they are also entitled to summary judgment on defendants' state law antitrust claims. *See Hardy Bros. Body Shop, Inc. v. State Farm Mut. Auto. Ins. Co.,* 848 F.Supp. 1276, 1290 (S.D.Miss.1994)("[W]here a

---

**9.** Nor could one reasonably conclude Monsanto had a dangerous probability of acquiring monopoly power.

**10.** Defendants aver in their brief to Monsanto's control over the glyphosate molecule market; however, the Scruggses' counsel conceded at oral argument that defendants had not pursued those issues in discovery.

court finds no federal antitrust violations, allegations of state law antitrust violations may be dismissed as well."). See also *Futurevision Cable Systems of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F.Supp. 760, 780 (S.D.Miss.1992).

### Patent Misuse Defense

■ As the Federal Circuit recognized in *McFarling*, the purpose of the patent misuse doctrine is "to prevent a patentee from using the patent to obtain market benefit beyond that which inures in the statutory patent right." *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed.Cir.1992). The pivotal question is, "whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed.Cir.1998). Where a restriction is reasonably within the patent grant, the defense cannot succeed. *See Gen. Talking Pictures Corp. v. W. Elec. Co.*, 305 U.S. 124, 127, 59 S.Ct. 116, 83 L.Ed. 81, (1938). As the lengthy analysis, *supra*, shows, there is no evidence Monsanto used its patents to secure rights beyond the scope of its lawful patent monopoly. Defendants' patent misuse defense thus fails.

### CONCLUSION

Based on the foregoing facts and analysis, the Court concludes Monsanto's Motion for Summary Judgment on Counts Six, Seven, Eight and Nine of Defendants' Counterclaim (Defendants' Antitrust Claims) [401–1] is well-taken and should be granted. An Order will issue accordingly.