# United States Court of Appeals for the Federal Circuit

04-1532, 05-1120,-1121

MONSANTO COMPANY,

Plaintiff-Appellee,

v.

MITCHELL SCRUGGS, EDDIE SCRUGGS,
SCRUGGS FARM & SUPPLIES, LLC,
SCRUGGS FARM JOINT VENTURE, HES FARMS, INC.,
MES FARMS, INC., and MHS FARMS, INC.,

Defendants-Appellants.

Seth P. Waxman, Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief was Paul R.Q. Wolfson. Of counsel on the brief was Joseph C. Orlet, Husch & Eppenberger, LLC, of St. Louis, Missouri.

James L. Robertson, Wise, Carter, Child & Caraway, P.A., of Jackson, Mississippi, argued for defendants-appellants. With him on the brief was Meredith B. Aden.

James L. Jones, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., of Jackson, Mississippi for amicus curiae Shea Leatherman d/b/a Riverfield Farms. With him on the brief was Bradley S. Clanton.

Christopher P. Murphy, Arent Fox PLLC, of Washington, DC, for amicus curiae The Biotechnology Industry Organization. With him on the brief was Amy E.L. Schoenhard.

E. Anthony Figg, Rothwell Figg Ernst & Manbeck P.C., of Washington, DC, for amicus curiae Delta and Pine Land Company. With him on the brief were Jeffrey L. Ihnen and Barbara Webb Walker. Of counsel on the brief was Jerome C. Hafter, Phelps Dunbar, of Jackson, Mississippi.

Gary Jay Kushner, Hogan & Hartson L.L.P., of Washington, DC, for amicus curiae American Seed Trade Association. With him on the brief were Lorane F. Hebert and Ryan D. Shadrick.

Sondra Simpson McLemore, Special Assistant Attorney General for the State of Mississippi, of Jackson, Mississippi, for amicus curiae State of Mississippi.  With her on the brief was Jim Hood, Attorney General.

Joseph Mendelson III, Center for Food Safety, of Washington, DC, for amicus curiae Center for Food Safety.

Mark R. Patterson, Fordham University School of Law, of New York, New York, for amicus curiae American Antitrust Institute.

Appealed from:    United States District Court for the Northern District of Mississippi

Judge W. Allen Pepper, Jr.

# United States Court of Appeals for the Federal Circuit

04-1532, 05-1120,-1121

MONSANTO COMPANY,

Plaintiff-Appellee,

v.

MITCHELL SCRUGGS, EDDIE SCRUGGS,
SCRUGGS FARM & SUPPLIES, LLC,
SCRUGGS FARM JOINT VENTURE, HES FARMS, INC.,
MES FARMS, INC., and MHS FARMS, INC.,

Defendants-Appellants.

_____

DECIDED:  August 16, 2006

_____

Before MAYER, BRYSON, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge MAYER.  Concurring in part and dissenting in part opinion filed by Circuit Judge DYK.

MAYER, Circuit Judge.

Mitchell Scruggs; Eddie Scruggs; Scruggs Farm & Supplies, LLC; Scruggs Farm Joint Venture; HES Farms, Inc.; MES Farms, Inc.; and MHS Farms, Inc. (collectively "Scruggs") appeal the judgment of the United States District Court for the Northern District of Mississippi granting Monsanto Company's ("Monsanto's") motions for summary judgment of patent invalidity and infringement, Monsanto Co. v. Scruggs, 342 F. Supp. 2d 584 (N.D. Miss. 2004) ("Summary Judgment I"); antitrust violations and

patent misuse, Monsanto Co. v. Scruggs, 342 F. Supp. 2d 568 (N.D. Miss. 2004) ("Summary Judgment II"); and common law counterclaims of, inter alia, tortious interference, unfair competition, and invasion of privacy, Monsanto Co. v. Scruggs, 342 F. Supp. 2d 602 (N.D. Miss. 2004). Additionally, Scruggs appeals the trial court's order granting Monsanto a permanent injunction. Monsanto Co. v. Scruggs, No. 3:00CV161-P-D (N.D. Miss. Nov. 4, 2004) (order granting permanent injunction). We affirm, vacate, and remand.

## Background

Monsanto owns U.S. Patent No. 5,352,605 ("the '605 patent"), which is directed toward insertion of a synthetic gene consisting of a 35S cauliflower mosaic virus ("CaMV") promoter, a protein sequence of interest, and a stop signal, into plant DNA to create herbicide resistance. Monsanto also owns U.S. Patent Nos. 5,164,316; 5,196,525; and 5,322,938 (collectively "the McPherson patents"), which are directed toward insect resistant traits. The McPherson patents expand upon the '605 patent in several ways, including disclosure of an enhanced CaMV 35S promoter.

Monsanto used the technology in the '605 patent to develop glyphosate herbicide resistant soybeans and cotton, sold as Roundup Ready (R) soybeans and cotton. One of the glyphosate herbicides to which the Roundup Ready (R) plants are resistant is Roundup, which is also sold by Monsanto. Monsanto used the '605 patent in combination with the McPherson patents to develop stacked trait cotton ("Bollgard/Roundup Ready (R) cotton"), which is resistant to glyphosate herbicide and certain insects.

Monsanto began licensing its biotechnology to seed companies ("seed sellers"); it licensed Roundup Ready (R) technology starting in 1996 and Bollgard/Roundup Ready (R) cotton technology starting in 1998. The licenses allow seed growers to incorporate the Monsanto biotechnology into their germplasm to produce Roundup Ready (R) and Bollgard/Roundup Ready (R) seeds. The licenses also impose certain restrictions on seed sellers, including that seed companies may not sell seed containing Monsanto's technology to growers unless the grower signs one of Monsanto's license agreements; and that seed so sold may be used by growers to grow only a single commercial crop. Monsanto's restrictions on seed growers include: (1) requiring growers to use only seed containing Monsanto's biotechnology for planting a single crop ("exclusivity provision"); (2) prohibiting transfer or re-use of seed containing the biotechnology for replanting ("no replant policy"); (3) prohibiting research or experimentation ("no research policy"); and (4) requiring payment of a "technology fee."

Scruggs purchased both Roundup Ready (R) soybean seeds and Bollgard/Roundup Ready (R) cotton seeds from seed companies, but never signed a licensing agreement. It planted the purchased seeds, and after harvesting the soybeans and cotton, retained the new generation of seeds. Its subsequent crops were planted with those retained seeds, as well as with seeds obtained from subsequent generations of crops.

Monsanto investigated Scruggs' activities and filed suit for infringement of the '605 and McPherson patents. The trial court issued a preliminary injunction, prohibiting Scruggs from further sale and use of seeds containing Monsanto's patented biotechnology. Scruggs answered with federal and state antitrust claims and patent

misuse affirmative defenses. Specifically, it asserted that Monsanto violated the Sherman Act, 15 U.S.C. §§ 1-2, by tying the purchase of seed to the purchase of Roundup through grower license agreements, grower incentive agreements, and seed partner license agreements, as well as by tying the Roundup and Bollgard traits in cotton seeds. It also asserted Monsanto violated section 2 of the Sherman Act by unlawfully monopolizing or attempting to monopolize a relevant market. Additionally, Scruggs asserted common law counterclaims of invasion of privacy, trespass, tortious interference with contract and/or business relations, abuse of process, conversion, nuisance, strict liability in tort, negligence, and unfair competition.

Scruggs denied infringement and sought a declaration of invalidity of the '605 and McPherson patents. Monsanto moved for summary judgment on infringement, the antitrust and patent misuse defenses, and the common law counterclaims. Scruggs moved to vacate the preliminary injunction, and cross-moved for summary judgment. Monsanto's motions for summary judgment were granted, and Scruggs' motion to vacate the preliminary injunction was denied. The trial court then issued a permanent injunction and a final judgment. Proceedings on damages were stayed pending this appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a).

Discussion

We review the trial court's grant of summary judgment de novo. See Caterpillar Inc. v. Sturman Indus., 387 F.3d 1358, 1373 (Fed. Cir. 2004). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

04-1532, 05-1120,-1121                    4

Fed. R. Civ. P. 56(c).  "With regard to 'materiality,' only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment."  Phillips Oil Co. v. OKC Corp., 812 F.2d 265, 272 (5th Cir. 1987).

## I. Infringement

Infringement occurs when a properly construed claim reads on the accused product.  Atlas Powder Co. v. E.I. du Pont & Co., 750 F.2d 1569, 1579 (Fed. Cir. 1984).  In this case, Monsanto must show that its Roundup Ready (R) and Bollgard/Roundup Ready (R) seeds are covered by the '605 and/or McPherson patents and that Scruggs used those seeds in a way that violated Monsanto's patent rights.  Affirmative defenses to infringement include noninfringement, unenforceability, invalidity (e.g., failing to satisfy the written description or enablement requirements), 35 see U.S.C. § 282, patent misuse, see Senza-Gel Corp. v. Seiffhart, 803 F.2d 661 (Fed. Cir. 1986), and the existence of an implied license, see Carborundum Co. v. Molten Metal Equip. Innovations, 72 F.3d 872, 878 (Fed. Cir. 1995).

In granting Monsanto's motion for summary judgment of infringement, the trial court relied on Scruggs' admissions with respect to: (1) its purchasing of the Roundup Ready (R) soybeans and Bollgard/Roundup Ready (R) cotton; (2) its failing to obtain a license from Monsanto; and (3) its saving of soybean and cotton seed for future planting.  Summary Judgment I 342 F. Supp. at 593-94.  Additionally, the court pointed to Monsanto's scientific tests showing that Scruggs' soybean and cotton crops contained Monsanto's patented technology.  Id. at 594.

Scruggs argued that: (1) neither Monsanto's biotechnology (Roundup Ready (R) soybeans and Bollgard/Roundup Ready (R) cotton) nor the plants in Scruggs' fields were covered by the patents-in-suit; (2) the promoter sequences in Monsanto's biotechnology did not match the sequences claimed in the '605 patent; and (3) Monsanto's test results should be disregarded for not complying with accepted scientific standards. The trial court rejected those arguments. Scruggs' affirmative defenses to infringement included: (1) lack of proper notice of the patents-in-suit; (2) the existence of an implied license to use the Monsanto technology; (3) the doctrine of patent exhaustion; (4) violation of the Plant Variety Protection Act; (5) patent misuse; and (6) patent invalidity.

With respect to the implied license affirmative defense, the trial court found that Scruggs had "no reasonable expectation that they could use Monsanto's patented biotechnology unless they first obtained a license" and, therefore, had no implied license. Id. at 598. Next, the court found the patent exhaustion defense inapplicable because Monsanto never made an unrestricted sale of its biotechnology. Id. at 598-99. Finally, it rejected Scruggs' remaining affirmative defenses.

On appeal, Scruggs again argues that the patent claims do not read on its plants, that Monsanto's test results showing that Scruggs' soybean and cotton crops contained Monsanto's Roundup Ready (R) and Bollgard technology should be disregarded, that the patent exhaustion doctrine applies, and that Scruggs had an implied license.

With respect to the argument that the claims in the '605 patent do not read on the Roundup Ready (R) seeds, Scruggs specifically argues that the CaMV 35S promoter sequence in Roundup Ready (R) soybeans is different from and shorter than the

promoter from the CM4-184 strain of the CaMV noted in the '605 patent; therefore, the '605 patent does not cover the Roundup Ready (R) biotechnology. However, the specification in the '605 patent states that different strains of CaMV may be used in the invention. The fact that the promoter in the Roundup Ready (R) soybeans differs from the CM4-184 CaMV strain mentioned in the '605 patent specification by a few dozen nucleotides is, therefore, not disparities. Moreover, Scruggs does not appeal the trial court's claim construction of the '605 patent as covering "a promoter element [] selected from the group consisting of either a 35S cauliflower mosaic virus promoter or a 19S cauliflower mosaic promoter . . ." Id. at 591. Thus, the court's finding that the '605 patent employs the promoter from CaMV generally, and not just that in the CM4-184 strain, must stand. In addition, the promoter used in Roundup Ready (R) seeds matches published sequence information about the CaMV 35S promoter, which is incorporated by reference into the '605 patent, and therefore is covered by the patent. Finally, Scruggs' argument that the promoter in Roundup Ready (R) seeds is shorter than the promoter covered by the '605 patent fails because the deletions in the Roundup Ready (R) DNA are in the enhancer region of the DNA inserted into the cotton and soybean DNA, not in the promoter region. Accordingly, the Roundup Ready (R) seeds are covered by the '605 patent.

Scruggs also argues on appeal that Monsanto's test results showing that Scruggs' soybean and cotton crops contained Roundup Ready (R) and Bollgard technology should be disregarded for failing to use a negative control. However, it fails to point to any evidence contradicting Monsanto's results, which establish that its crops contain Monsanto's patented biotechnology. It merely presents hypothetical situations

to suggest that Monsanto's test results <u>could</u> be flawed.  Given the evidence in the record, hypotheses alone are insufficient to create a genuine issue of material fact.

In its brief, Scruggs attempts to incorporate by reference a portion of the supporting memorandum for summary judgment it submitted to the trial court.  Those arguments also pertain to "deficiencies" in the testing done by Monsanto.  However, argument by incorporation, such as by referring to a summary judgment memoranda for legal analysis, is a violation of Fed R. App. P. 28(a)(6).  <u>See</u> <u>Graphic Controls Corp. v. Utah Med. Prods., Inc.</u>, 149 F.3d 1382, 1385 (Fed. Cir. 1998).  Therefore, those arguments are deemed waived.  But even a casual perusal shows they would fail for the same reasons they failed below: Scruggs' failure to point to evidence raising a genuine issue of material fact.

Scruggs argues that it purchased the Monsanto seeds in an unrestricted sale, and that it was therefore entitled to use those seeds in an unencumbered  fashion under the doctrine of patent exhaustion.  The first sale/patent exhaustion doctrine establishes that the unrestricted first sale by a patentee of his patented article exhausts his patent rights in the article.  <u>See</u> <u>Mallinckrodt, Inc. v. Medipart, Inc.</u>, 976 F.2d 700, 701 (Fed. Cir. 1992); <u>see also</u> <u>LG Elecs., Inc. v. Bizcom Elecs., Inc.</u>, 2006 U.S. App. Lexis 16916, at *7-*8 (Fed. Cir. July 7, 2006).  The doctrine of patent exhaustion is inapplicable in this case.  There was no unrestricted sale because the use of the seeds by seed growers was conditioned on obtaining a license from Monsanto.  Furthermore, the "'first sale' doctrine of exhaustion of the patent right is not implicated, as the new seeds grown from the original batch had never been sold."  <u>See</u> <u>Monsanto v. McFarling</u>, 302 F.3d 1291, 1299 (Fed. Cir. 2002).  Without the actual sale of the second generation seed to

Scruggs, there can be no patent exhaustion. The fact that a patented technology can replicate itself does not give a purchaser the right to use replicated copies of the technology. Applying the first sale doctrine to subsequent generations of self-replicating technology would eviscerate the rights of the patent holder.

Scruggs also argues that it had an implied license to use Monsanto's technology. In order to establish an implied license, the "circumstances of the sale must 'plainly indicate that the grant of a license should be inferred.'" Met Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 686 (Fed. Cir. 1986) (citations omitted); see also LG Elecs., Inc., 2006 U.S. App. Lexis 16916, at *6-*7. It is undisputed that Monsanto requires all licensees to place a notice on all bags of Roundup Ready (R) seeds stating that the seeds are covered by U.S. Patents, that the purchase of the seeds conveys no license, and that a license from Monsanto must be obtained before using the seeds. Therefore, the circumstances of the sale indicate that Scruggs had no implied license to use Monsanto's patented biotechnology. Furthermore, because the seed distributors had no authority to confer a right to use Monsanto's biotechnology, they could not confer any sort of license to use the seeds. See Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476 (1964) (a seller cannot confer broader rights via an implied license than it has been granted by the patent holder).

## II. Validity

To satisfy the written description requirement of 35 U.S.C. § 112 for inventions pertaining to DNA, a patent must provide "sufficiently detailed, relevant identifying characteristics . . . i.e., complete or partial structure, other physical and/or chemical properties, functional characteristics when coupled with a known or disclosed

correlation between function and structure, or some combination of such characteristics." Enzo Biochem Inc., v. Gen-Probe Inc., 323 F.3d 956, 964 (Fed. Cir. 2002) (citation omitted). However, neither a specific DNA sequence nor a biological deposit is required to meet a written description requirement if the biological material is known and readily available to the public. Id. at 965. "[R]eference in the specification to a deposit in a public depository, which makes its contents accessible . . . constitutes an adequate [written] description . . ." Id. The written description requirement helps to ensure that the patent applicant actually invented the claimed subject matter and was in possession of the patented invention at the time of filing. Univ. of Rochester v. G.D. Searle & Co., 358 F.3d 916, 926 (Fed. Cir. 2004), rehearing denied 375 F.3d 803, cert denied 543 U.S. 1015 (2004). Because a patent carries a statutory presumption of validity, 35 U.S.C. § 282, Scruggs has the burden of showing by clear and convincing evidence, after all reasonable inferences are drawn in its favor, that the '605 and McPherson patents are invalid, see WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1355 (Fed. Cir. 1999).

Scruggs argued patent invalidity to the trial court as a defense to infringement and asserted that the patents-in-suit fail the written description requirement for not disclosing specific gene sequences in the text of the patents. The court found, however, that there was no need for specific gene sequences to be disclosed because the patents do not cover one particular gene sequence and because the patent specifications "clearly describe promoters already known to those skilled in the art." Summary Judgment I, 342 F. Supp. 2d at 601. The trial court also concluded that

Scruggs failed to meet its burden of proof by presenting insufficient evidence from which a reasonable fact finder could find lack of enablement.

Scruggs again asserts on appeal that the '605 and McPherson patents are invalid for failing to satisfy the written description requirement. With respect to the '605 patent, it says that Monsanto should have been required to include a specific DNA sequence for the promoter or that, at a minimum, Monsanto should have offered a reason why it did not include specific promoter sequences in the '605 patent. These arguments are unsupported in law. At the time of the '605 patent application, those of ordinary skill in the art knew the DNA sequences of several strains of the CaMV virus, the location of the CaMV promoters, and the DNA sequences for several CaMV 35S promoters. Given the knowledge in the art, it was unnecessary for the '605 patent to include specific gene sequences when referring to the CaMV 35S promoter to meet the written description requirement. Nor is there a requirement that a patent holder justify its decision to omit specific sequence information from a patent. The written description requirement was satisfied because the '605 patent incorporates by reference deposits with the American Type Culture Center, which are publicly available. '605 patent col.5 ll.40-44.

With respect to the McPherson patents, Scruggs argues that they fail the written description requirement for the same reasons as it argues the '605 patent is invalid. Those arguments do not surmount Scruggs' burden of proof for the same reason its arguments with respect to the '605 patent fail. Scruggs also argues that the McPherson patents are invalid because they do not specifically identify enhancer sequences in the DNA and that the McPherson patents are "suspect" because the specifications are

similar but the claims are different. Scruggs points to no evidence sufficient to meet its burden of proof with respect to invalidity. It states that it is unreasonable to claim a range of DNA sequences in the McPherson patents and seems to suggest that such a range should necessarily make them invalid for lack of a written description. No law supports this assertion. Scruggs fails to point to any evidence showing that McPherson did not possess the invention at the time of filing. See Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1561 (Fed. Cir. 1991). Furthermore, the argument that the McPherson patents are "suspect" for containing similar specifications is unsupported by requirements for written description. The patents are continuations or divisionals of a common parent application and therefore necessarily have almost identical specifications. Nothing about a continuation or divisional patent makes it inherently more likely to fail the written description requirement or changes the burden of proof with respect to proving invalidity.

Scruggs also asserts on appeal that the '605 patent is invalid for not satisfying the enablement requirement. Under 35 U.S.C. § 112, a patent must "enable any person skilled in the art . . . to make and use the [invention]" without undue experimentation. Chiron Corp. v. Genentech, Inc., 363 F.3d 1247, 1253 (Fed. Cir. 2004). It first argues that the '605 patent is not enabling because no particular gene sequence is claimed and because only one example of the entire genus of CaMV promoters is described in the specification. First, as discussed above, more than one example of CaMV is described; the patent, for instance, refers to biological deposits of the CaMV strains that can be obtained to make the invention. Moreover, because of the level of skill in the art and the publicly available information about CaMV, no specific gene sequence needed to be

claimed for someone of ordinary skill in the art to understand how to make and use the invention. Scruggs also seems to argue that, at a minimum, one must disclose in the specification the exact DNA sequence of most species of the claimed genus. It is true that in some cases specific DNA sequences may be required to satisfy the enablement requirement, namely where the level of skill in the art is low and there is little publicly available information about that DNA. Here, however, specific sequences are not required because CaMV is well-known and well-documented. Scruggs presented insufficient evidence to demonstrate that others would have been unable to practice the claimed invention without undue experimentation. The fact that <u>some</u> experimentation may be necessary to produce the invention does not render the '605 patent invalid for lack of enablement. <u>Id.</u> Because Scruggs has failed to meet its burden of proof, it has not shown the '605 patent invalid for lack of enablement.

### III. Antitrust/Patent Misuse

Antitrust laws may be violated if a patent holder's conduct falls outside the protection afforded by the patent laws. <u>United States v. Line Material Co.</u>, 333 U.S. 287, 308 (1948). Under the patent laws, a patentee has the right to exclude others from making, using, or selling a patented invention. 35 U.S.C. § 154(a)(1). Conduct falling within the scope of protection includes, <u>inter alia</u>, limited use licensing, <u>see</u> <u>Mallinckrodt, Inc. v. Medipart, Inc.</u>, 976 F.2d 700, 703 (Fed. Cir. 1992), and charging of royalties, <u>Brulotte v. Thys Co.</u>, 379 U.S. 29 (1964). Field of use licensing restrictions, i.e., permitting the use of inventions in one field and excluding it in others, are also within the scope of the patent grant. <u>See</u> <u>Gen. Talking Picture Corp. v. W. Elec. Co.</u>, 305 U.S. 124, 127 (U.S. 1938).

Under section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is [] declared to be illegal." Tying arrangements fall under section 1 of the Sherman Act. "A tying arrangement is the sale or lease of one product on the condition that the buyer or lessee purchase a second product." Breaux Bros. Farms, Inc. v. Teche Sugar Co., Inc., 21 F.3d 83, 85 (5th Cir. 1994). To prove that a tying arrangement exists, the plaintiff must show: (1) the involvement of two separate products or services; (2) the sale of one product or service is conditioned on the purchase of another; (3) the seller has market power in the tying product; and (4) the amount of interstate commerce in the tied product is not insubstantial. Eastman Kodak Co. v. Image Tech. Serv., Inc., 504 U.S. 451, 461-62 (1992).

Under section 2 of the Sherman Act, unlawful monopolization is prohibited. To establish a section 2 violation, one must prove that the party charged had monopoly power in a relevant market and acquired or maintained that power by anti-competitive practices instead of by competition on the merits. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 (1985).

Patent misuse may be found even where there is no antitrust violation, because "[p]atent misuse is . . . a broader wrong than [an] antitrust violation." C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1372 (Fed. Cir. 1998). The "policy of the patent misuse doctrine is 'to prevent a patentee from using the patent to obtain market benefit beyond that which inures in the statutory patent right.'" Monsanto Co. v. McFarling, 363 F.3d 1336, 1341 (Fed. Cir. 2004) (quoting Mallinckrodt, 976 F.2d at 704 ("Monsanto II"). In order for competitive behavior to amount to patent misuse, one must "impermissibly

broaden[] the scope of the patent grant with anticompetitive effect." Id. Thus, "[i]n the cases in which the restriction is reasonably within the patent grant, the patent misuse defense can never succeed." Id. Moreover, "[n]o patent owner otherwise entitled to relief . . . shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having . . . refused to license or use any rights to the patent . . . ." 35 U.S.C. § 271(d).

At trial, Scruggs asserted that Monsanto's commercial practices violate federal and state antitrust laws, and constitute patent misuse. The specific practices it attacked were Monsanto's seed grower incentive programs, its seed partner license agreements, its grower license agreements, and its alleged refusal to sell Roundup Ready (R) cotton seeds without the Bollgard trait. Monsanto's grower license agreements include an exclusivity provision, a no replant policy, a no research policy, and the payment of a technology fee. Additionally, its grower license agreements between 1996 and 1998 stated that if a grower chose to use glyphosate herbicide in connection with Roundup Ready (R) seeds, then the grower must use Roundup ("1996 Roundup restriction"). At that time, Roundup was the only glyphosate herbicide approved by the Environmental Protection Agency for use with Roundup Ready (R) seeds. Monsanto's grower incentive agreements give participating seed growers additional voluntary benefits if they choose to use Roundup herbicide exclusively on crops containing Monsanto's Roundup technology. Monsanto's seed partner agreements require seed growers who choose to use a glyphosate herbicide to use Roundup.

The trial court stated that Monsanto's no replant policy was not subject to challenge under the antitrust laws because the identical policy had been found valid and

within its rights under the patent laws in <u>Monsanto Co. v. McFarling</u>, 363 F.3d 1336, 1343 (Fed. Cir. 2004). The court also found that the technology fees imposed by Monsanto were within the scope of its patent rights. Finally, the court found that the no research policy and Monsanto's refusal to allow seed partners to stack the Roundup Ready (R) trait with transgenic traits developed by competitors to be "field of use restrictions which fall within the scope of the patent monopoly [that] are, therefore, lawful." <u>Summary Judgment II</u>, 342 F. Supp.2d at 575.

The trial court specifically addressed Scruggs' antitrust claims under section 1 of the Sherman Act, applying both per se and rule of reason analyses. In its per se analysis, the court found that the 1996 Roundup restriction did not constitute per se illegal tying; Roundup was the only EPA-approved product for use over the top of the Roundup seeds from 1996 to 1998, and only the licenses taken out during those years had the Roundup herbicide restriction. The court also found Monsanto's grower incentive agreements to be legal restraints because they simply give growers an incentive to choose Roundup herbicide and do not coerce them into purchasing it. Next, the court found that Scruggs failed to demonstrate that Monsanto forced seed partners to buy Roundup in order to obtain a license. The court stated that if the seed partner agreements did amount to a tie, per se treatment was not appropriate. Finally, it found that Scruggs failed to prove Monsanto illegally tied the Roundup Ready (R) trait to the Bollgard trait in cotton. The court stated that the record did not support the claim that Monsanto "engineered a shortage of single trait cotton seed which 'forced' growers to buy stacked trait seed . . . ." <u>Id.</u> at 579.

04-1532, 05-1120,-1121                    16

Under its rule of reason analysis, the trial court also found the evidence Scruggs presented with respect to the tying claims insufficient. Scruggs argued that Monsanto's binding of dealers in downstream markets to the same restrictions it imposes on its seed partners (in a "third party clause") was a violation of section 1 of the Sherman Act, as were the grower incentive agreements. The court found that the third party clause was a valid restriction because limited use licenses are valid, and the third party clause simply amounted to a limited use. Additionally, the court held that the grower incentive agreements were valid; the provisions were merely financial incentives and "d[id] not foreclose competition in a substantial share of the relevant product market(s)." Id. at 581.

The trial court also found that: (1) Scruggs' evidence was insufficient with respect to proving a violation of section 2 of the Sherman Act for unlawful monopolization or attempted monopolization; (2) because there was no federal antitrust violation, the alleged state antitrust violations could also be dismissed on summary judgment; and (3) patent misuse was inapplicable because Monsanto did not use its patents to impermissibly broaden the scope of its patent grant.

On appeal, Scruggs reasserts that the exclusivity provision, no replant policy, and technology fee payments required by Monsanto's licensing agreements with seed growers are illegal anticompetitive practices. Monsanto has a right to exclude others from making, using, or selling its patented plant technology, see Brulotte, 379 U.S. at 29-30, and its no replant policy simply prevents purchasers of the seeds from using the patented biotechnology when that biotechnology makes a copy of itself. This restriction therefore is a valid exercise of its rights under the patent laws. Furthermore,

Monsanto's uniform technology fee is essentially a royalty fee, the charging of which is also within the scope of the patent grant. Lastly, the no research policy is a field of use restriction and is also within the protection of the patent laws.

Scruggs also argues on appeal that Monsanto ties the purchase of its seed to the purchase of Roundup through grower license restrictions, grower incentive agreements, and seed partner agreements. It asserts that Monsanto unlawfully ties the Roundup Ready trait to the Bollgard trait in cotton seeds. It does not point to sufficient evidence to establish that Monsanto's behavior constitutes illegal tying. The grower incentive program was optional, not coerced. Additionally, Monsanto's seed partners were not forced to buy Roundup under the seed partner agreements. Furthermore, there is no merit to the argument that Monsanto illegally tied the sale of cotton containing the Roundup Ready (R) gene to the sale containing the Bollard trait; Monsanto sells cotton without the Bollgard trait and there is no evidence that Monsanto engineered a shortage of Roundup Ready (R) cotton.

Lastly, Scruggs asserts that the trial court's decision should be sent back for a separate patent misuse analysis, because the burden of proving patent misuse is lower. However, patent misuse covers only activity falling outside of the patent grant, and Scruggs did not point to any activity falling outside Monsanto's patent.

The dissent argues that Federal Trade Commission v. Indiana Federation of Dentists, 476 U.S. 447 (1986), and Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457 (1941), compel a finding of patent misuse; they do not. In those cases, the antitrust defendants argued that their anticompetitive conduct should be excused on the ground that it provided benefits and furthered a

public policy unrelated to competition. The Supreme Court rejected those arguments, holding that collusive agreements between competitors do not become lawful simply because they may have some other beneficial effects. In this case, Monsanto does not argue that it should escape a finding of patent misuse because its contract provisions protected the public or furthered EPA policy; rather, Monsanto's argument is that its contract provisions lacked any anticompetitive effect because EPA's regulations prohibited growers from using competing glyphosate herbicides for over-the-top application. Therefore, even if growers elected to use such herbicides for over-the-top application, they would not be legally free to use competing brands. As the trial court noted, the record supports Monsanto's argument; Scruggs has not pointed to any evidence to the contrary. The record shows that Monsanto's competitors sought and obtained regulatory approval and that when they did, Monsanto modified its contracts accordingly. In this unusual setting, the rule of reason applies to the defense of patent misuse based on the alleged tying arrangement, and under the rule of reason, Scruggs is required to show that the challenged contracts had an actual adverse effect on competition. See U.S. Philips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179, 1185 (Fed. Cir. 2005). Scruggs did not do so and therefore cannot use the challenged contract provisions as a defense against Monsanto's patent infringement claims. Therefore, Monsanto's behavior did not constitute patent misuse.

## IV. Common Law Counterclaims

Scruggs attempts to appeal the trial court's findings with respect to tortious interference, unfair competition, and invasion of privacy. In order for this court to reach the merits of an issue on appeal, it must be adequately developed. See Graphic

Controls, 149 F.3d at 1385; United States v. Elder, 90 F.3d 1110, 1118 (6th Cir. 1996). Argument by incorporation, such as by referring to a summary judgment memoranda for legal analysis in an appellate brief, is a violation of Fed R. App. P. 28(a). Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1339 (Fed. Cir. 2005). Moreover, merely stating disagreement with the trial court does not amount to a developed argument. See, e.g., Anderson v. City of Boston, 375 F.3d 71, 91 (1st Cir. 2004). Here, Scruggs failed to develop its arguments and attempted to make arguments by incorporation in its brief. These arguments are therefore deemed waived.

## V. Permanent Injunction

eBay Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837 (2006), requires courts to consider the standard four part test for permanent injunctions in patent cases and reverses this court's traditional rule that "courts will issue permanent injunctions against patent infringement absent exceptional circumstances[,]" MercExchange, L.L.C. v eBay Inc., 401 F.3d 1323, 1339 (Fed. Cir. 2005). Therefore, we vacate the trial court's decision with respect to the permanent injunction and remand for reconsideration in light of the Supreme Court's eBay case.

## Conclusion

Accordingly, the judgment of the United States District Court for the Northern District of Mississippi is affirmed. The order granting a permanent injunction is vacated and the case is remanded.

## COSTS

Monsanto shall have its costs.

## AFFIRMED, VACATED, AND REMANDED

04-1532, 05-1120,-1121                    20

# United States Court of Appeals for the Federal Circuit

04-1532, 05-1120, -1121


MONSANTO COMPANY,

Plaintiff-Appellee,

v.

MITCHELL SCRUGGS, EDDIE SCRUGGS,
SCRUGGS FARM & SUPPLIES, LLC,
SCRUGGS FARM JOINT VENTURE, HES FARMS, INC.,
MES FARMS, INC., and MHS FARMS, INC.,

Defendants-Appellants.


DYK, Circuit Judge, concurring in part and dissenting in part.

I join the majority opinion except for Part III, from which I respectfully dissent. Scruggs argues that Monsanto's grower license agreements between 1996 and 1998 unlawfully tied the purchase of Roundup herbicide to the purchase of Roundup ready seeds, and that this constituted patent misuse, rendering the patent unenforceable. The district court rejected this argument. In Part III, the majority also rejects this contention, on the ground that the agreements, in essence, merely enforced then-existing EPA regulations. See Ante at 14-15. With respect, I think that the district court's decision in this respect, approved by the majority, is contrary to Supreme Court precedent.

I

As a condition on the purchase of Roundup Ready seeds between 1996 and 1998, Monsanto required that growers execute a licensing agreement containing the following (or similar) language. "You [the grower] agree: . . . [i]f a herbicide containing

the same active ingredient as Roundup Ultra™ herbicide [glyphosate] (or one with a similar mode of action) is used over the top of Roundup Ready crops, you agree to use only Roundup® branded herbicide." J.A. at 309. Scruggs claims that this provision unlawfully tied the sale of Roundup brand glyphosate herbicides to the sale of Roundup Ready seeds.[1]

The district court held, and Monsanto agrees, that the provision was justified by the fact that Roundup was the only glyphosate herbicide approved by the EPA at that time for use "over the top" of crops. The district court concluded that "[b]ecause Roundup was the only product labeled for use 'over-the-top' of Roundup Ready crops between 1996 and 1998, it was the only EPA-approved herbicide that <u>could</u> be used on Roundup Ready crops during that period[,]" and thus that the "defendants . . . failed to meet their burden of producing significant probative evidence that Monsanto forced farmers who wanted to purchase Roundup Ready seeds to purchase Roundup as well." <u>Monsanto Co. v. Scruggs</u>, 342 F. Supp. 2d 568, 577 (N.D. Miss. 2004). The majority agrees. <u>Ante</u> at 15-16. I read the Supreme Court cases as to the contrary.

The Supreme Court has unequivocally held: "That a particular practice may be unlawful is not, in itself, a sufficient justification for collusion among competitors to prevent it." <u>Fed. Trade Comm'n v. Ind. Fed'n of Dentists</u>, 476 U.S. 447, 465 (1986).[2]

---

[1]    The majority agrees that the patent misuse defense does not require a showing of antitrust standing. <u>Ante</u> at 14; <u>see also</u> 6 <u>Chisum on Patents</u> § 19.04[5], at 19-541 ("[I]t has been clear at least since <u>Morton Salt</u> that the individual defendant raising a [patent] misuse defense need not show that he was personally harmed by the abusive practice."); 6 <u>Chisum on Patents</u> § 19.04[5] nn.3-4 (collecting cases). Thus, the fact that Scruggs did not execute a grower licensing agreement containing the Roundup restriction is of no moment.

[2]    <u>See Fashion Originators' Guild of Am., Inc. v. Fed. Trade Comm'n</u>, 312 U.S. 457, 468 (1941) ("[E]ven if copying [of the Guild members' designs] were an

While the Supreme Court has not directly addressed this issue in the context of tying arrangements, I see no basis for applying a different rule or for justifying otherwise per se unlawful tying arrangements as designed to prevent illegal conduct. Monsanto urges that these cases are distinguishable because the competitors there sought to enforce state law, whereas here the tying arrangement is designed to enforce federal law. I see no basis for such a distinction. This is not a case in which federal law pervasively regulates, compels, or permits the allegedly anticompetitive conduct, which might create an implied antitrust immunity. See Billing v. Credit Suisse First Bos. Ltd., 426 F.3d 131, 164-65 (2d Cir. 2005).

II

Monsanto argues, however, that its licensing restrictions had no anticompetitive effect because the EPA regulations eliminated the possibility of competition in the market for glyphosate herbicides, the allegedly tied product. We faced a related contention in U.S. Philips Corp. v. International Trade Commission, 424 F.3d 1179 (Fed. Cir. 2005), where Philips' package patent licensing arrangements were challenged as impermissible ties. We held that the agreements were not per se unlawful, because there was no evidence of "commercially feasible" alternatives to the technology enabled by the allegedly tied patents in the relevant market. Thus "packaging those patents

---

acknowledged tort under the law of every state, that situation would not justify petitioners in combining together to regulate and restrain interstate commerce in violation of federal law."); see also Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 496 ("[W]e have declared that violations of antitrust laws could not be defended on the ground that a particular accused combination would not injure but would actually help manufacturers, laborers, retailers, consumers, or the public in general."); Int'l Harvester Co. v. Missouri, 234 U.S. 199, 209 (1914) ("It is too late in the day to assert against statutes which forbid combinations of competing companies that a particular combination was induced by good intentions.").

together with so-called essential patents can have no anticompetitive effect in the marketplace, because no competition for a viable alternative product is foreclosed." Id. at 1194.[3]

This case is distinguishable. This is not a situation in which there were no commercially feasible alternatives. There was evidence that manufacturers produced products that could have been used "over the top," and that all that was lacking was regulatory approval. In other words, Monsanto's tying arrangements here did no more than enforce a regulatory requirement. Substantial competitive risks inhere in such an arrangement. Potential competitors are potentially discouraged from seeking regulatory approval or attempting to have the regulation modified or eliminated. To the extent that such efforts are discouraged, the proponent of the tie has succeeded in eliminating competition.

Moreover, in this connection it is highly significant that Monsanto's grower license agreements did not simply require the use of a government-approved herbicide; they explicitly required the use of "Roundup branded herbicide." A potential herbicide competitor thus would be concerned that, even if it secured government approval of its product, use of the approved herbicide would still be barred under the contracts. The elimination of such potential competition is not permissible under the antitrust laws.

III

The district court did not make a finding as to Monsanto's market power in the alleged tying product. Ill. Tool Works, Inc. v. Indep. Ink, Inc., --- U.S. ---, 126 S. Ct. 1281, 1293 (2006); see Monsanto Co., 342 F. Supp. 2d at 575-80. I would vacate the

---

[3] Even then the court held that the arrangements might violate the antitrust laws under a rule of reason analysis. Id. at 1197.

04-1532,05-1120,-1121                    4

judgment as to the alleged tie in the 1996-1998 grower agreements, and remand for the district court to determine whether the relevant contract provision in fact constituted patent misuse and, if misuse occurred, whether it was purged.  See Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 668 n.10 (Fed. Cir. 1986).