(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BOWMAN *v.* MONSANTO CO. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 11–796.  Argued February 19, 2013—Decided May 13, 2013

Respondent Monsanto invented and patented Roundup Ready soybean seeds, which contain a genetic alteration that allows them to survive exposure to the herbicide glyphosate.  It sells the seeds subject to a licensing agreement that permits farmers to plant the purchased seed in one, and only one, growing season.  Growers may consume or sell the resulting crops, but may not save any of the harvested soybeans for replanting.  Petitioner Bowman purchased Roundup Ready soybean seed for his first crop of each growing season from a company associated with Monsanto and followed the terms of the licensing agreement.  But to reduce costs for his riskier late-season planting, Bowman purchased soybeans intended for consumption from a grain elevator; planted them; treated the plants with glyphosate, killing all plants without the Roundup Ready trait; harvested the resulting soybeans that contained that trait; and saved some of these harvested seeds to use in his late-season planting the next season.  After discovering this practice, Monsanto sued Bowman for patent infringement.  Bowman raised the defense of patent exhaustion, which gives the purchaser of a patented article, or any subsequent owner, the right to use or resell that article.  The District Court rejected Bowman's defense and the Federal Circuit affirmed.

*Held*: Patent exhaustion does not permit a farmer to reproduce patented seeds through planting and harvesting without the patent holder's permission.  Pp. 4–10.

  (a) Under the patent exhaustion doctrine, "the initial authorized sale of a patented article terminates all patent rights to that item," *Quanta Computer, Inc.* v. *LG Electronics, Inc.*, 553 U. S. 617, 625, and confers on the purchaser, or any subsequent owner, "the right to use [or] sell" the thing as he sees fit, *United States* v. *Univis Lens Co.*,

316 U. S. 241, 249–250.  However, the doctrine restricts the patent-
ee's rights only as to the "particular article" sold, *id.*, at 251; it leaves
untouched the patentee's ability to prevent a buyer from making new
copies of the patented item.  By planting and harvesting Monsanto's
patented seeds, Bowman made additional copies of Monsanto's pa-
tented invention, and his conduct thus falls outside the protections of
patent exhaustion.  Were this otherwise, Monsanto's patent would
provide scant benefit.  After Monsanto sold its first seed, other seed
companies could produce the patented seed to compete with Monsan-
to, and farmers would need to buy seed only once.  Pp. 4–7.

(b) Bowman argues that exhaustion should apply here because he
is using seeds in the normal way farmers do, and thus allowing Mon-
santo to interfere with that use would create an impermissible excep-
tion to the exhaustion doctrine for patented seeds.  But it is really
Bowman who is asking for an exception to the well-settled rule that
exhaustion does not extend to the right to make new copies of the pa-
tented item.  If Bowman was granted that exception, patents on
seeds would retain little value.  Further, applying the normal rule
will allow farmers to make effective use of patented seeds.  Bowman,
who purchased seeds intended for consumption, stands in a peculiar-
ly poor position to argue that he cannot make effective use of his soy-
beans.  Bowman conceded that he knew of no other farmer who
planted soybeans bought from a grain elevator.  In the more ordinary
case, when a farmer purchases Roundup Ready seed from Monsanto
or an affiliate, he will be able to plant it in accordance with Monsan-
to's license to make one crop.  Pp. 7–10.

657 F. 3d 1341, affirmed.

KAGAN, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 11–796

———

## VERNON HUGH BOWMAN, PETITIONER *v.* MONSANTO COMPANY ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[May 13, 2013]

JUSTICE KAGAN delivered the opinion of the Court.

Under the doctrine of patent exhaustion, the authorized sale of a patented article gives the purchaser, or any subsequent owner, a right to use or resell that article. Such a sale, however, does not allow the purchaser to make new copies of the patented invention. The question in this case is whether a farmer who buys patented seeds may reproduce them through planting and harvesting without the patent holder's permission. We hold that he may not.

I

Respondent Monsanto invented a genetic modification that enables soybean plants to survive exposure to glyphosate, the active ingredient in many herbicides (including Monsanto's own Roundup). Monsanto markets soybean seed containing this altered genetic material as Roundup Ready seed. Farmers planting that seed can use a glyphosate-based herbicide to kill weeds without damaging their crops. Two patents issued to Monsanto cover various aspects of its Roundup Ready technology, including a seed incorporating the genetic alteration. See Supp. App. SA1–21 (U. S. Patent Nos. 5,352,605 and RE39,247E); see also

657 F. 3d 1341, 1343–1344 (CA Fed. 2011).

Monsanto sells, and allows other companies to sell, Roundup Ready soybean seeds to growers who assent to a special licensing agreement. See App. 27a. That agreement permits a grower to plant the purchased seeds in one (and only one) season. He can then consume the resulting crop or sell it as a commodity, usually to a grain elevator or agricultural processor. See 657 F. 3d, at 1344–1345. But under the agreement, the farmer may not save any of the harvested soybeans for replanting, nor may he supply them to anyone else for that purpose. These restrictions reflect the ease of producing new generations of Roundup Ready seed. Because glyphosate resistance comes from the seed's genetic material, that trait is passed on from the planted seed to the harvested soybeans: Indeed, a single Roundup Ready seed can grow a plant containing dozens of genetically identical beans, each of which, if replanted, can grow another such plant—and so on and so on. See App. 100a. The agreement's terms prevent the farmer from co-opting that process to produce his own Roundup Ready seeds, forcing him instead to buy from Monsanto each season.

Petitioner Vernon Bowman is a farmer in Indiana who, it is fair to say, appreciates Roundup Ready soybean seed. He purchased Roundup Ready each year, from a company affiliated with Monsanto, for his first crop of the season. In accord with the agreement just described, he used all of that seed for planting, and sold his entire crop to a grain elevator (which typically would resell it to an agricultural processor for human or animal consumption).

Bowman, however, devised a less orthodox approach for his second crop of each season. Because he thought such late-season planting "risky," he did not want to pay the premium price that Monsanto charges for Roundup Ready seed. *Id.*, at 78a; see Brief for Petitioner 6. He therefore went to a grain elevator; purchased "commodity soybeans"

intended for human or animal consumption; and planted
them in his fields.[1]  Those soybeans came from prior har-
vests of other local farmers.  And because most of those
farmers also used Roundup Ready seed, Bowman could
anticipate that many of the purchased soybeans would
contain Monsanto's patented technology.  When he applied
a glyphosate-based herbicide to his fields, he confirmed
that this was so; a significant proportion of the new plants
survived the treatment, and produced in their turn a new
crop of soybeans with the Roundup Ready trait.  Bowman
saved seed from that crop to use in his late-season plant-
ing the next year—and then the next, and the next, until
he had harvested eight crops in that way.  Each year, that
is, he planted saved seed from the year before (sometimes
adding more soybeans bought from the grain elevator),
sprayed his fields with glyphosate to kill weeds (and any
non-resistant plants), and produced a new crop of glyphosate-
resistant—*i.e.,* Roundup Ready—soybeans.

After discovering this practice, Monsanto sued Bowman
for infringing its patents on Roundup Ready seed.  Bow-
man raised patent exhaustion as a defense, arguing that
Monsanto could not control his use of the soybeans be-
cause they were the subject of a prior authorized sale
(from local farmers to the grain elevator).  The District
Court rejected that argument, and awarded damages to
Monsanto of $84,456.  The Federal Circuit affirmed.  It
reasoned that patent exhaustion did not protect Bowman
because he had "created a newly infringing article."  657
F. 3d, at 1348.  The "right to use" a patented article follow-

_____

[1] Grain elevators, as indicated above, purchase grain from farmers
and sell it for consumption; under federal and state law, they generally
cannot package or market their grain for use as agricultural seed.  See
7 U. S. C. §1571; Ind. Code §15–15–1–32 (2012).  But because soybeans
are themselves seeds, nothing (except, as we shall see, the law) pre-
vented Bowman from planting, rather than consuming, the product he
bought from the grain elevator.

ing an authorized sale, the court explained, "does not include the right to construct an essentially new article on the template of the original, for the right to make the article remains with the patentee." *Ibid.* (brackets and internal quotation marks omitted). Accordingly, Bowman could not "'replicate' Monsanto's patented technology by planting it in the ground to create newly infringing genetic material, seeds, and plants." *Ibid.*

We granted certiorari to consider the important question of patent law raised in this case, 568 U. S. ___ (2012), and now affirm.

## II

The doctrine of patent exhaustion limits a patentee's right to control what others can do with an article embodying or containing an invention.[2] Under the doctrine, "the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc.* v. *LG Electronics, Inc.*, 553 U. S. 617, 625 (2008). And by "exhaust[ing] the [patentee's] monopoly" in that item, the sale confers on the purchaser, or any subsequent owner, "the right to use [or] sell" the thing as he sees fit. *United States* v. *Univis Lens Co.*, 316 U. S. 241, 249–250 (1942). We have explained the basis for the doctrine as follows: "[T]he purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward . . . by the sale of the article"; once that "purpose is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold." *Id.,* at 251.

Consistent with that rationale, the doctrine restricts a patentee's rights only as to the "particular article" sold, *ibid.*; it leaves untouched the patentee's ability to prevent

---

[2] The Patent Act grants a patentee the "right to exclude others from making, using, offering for sale, or selling the invention." 35 U. S. C. §154(a)(1); see §271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent").

a buyer from making new copies of the patented item. "[T]he purchaser of the [patented] machine . . . does not acquire any right to construct another machine either for his own use or to be vended to another." *Mitchell* v. *Hawley*, 16 Wall. 544, 548 (1873); see *Wilbur-Ellis Co.* v. *Kuther*, 377 U. S. 422, 424 (1964) (holding that a purchaser's "reconstruction" of a patented machine "would impinge on the patentee's right *'to exclude others from making'* . . . the article" (quoting 35 U. S. C. §154 (1964 ed.))). Rather, "a second creation" of the patented item "call[s] the monopoly, conferred by the patent grant, into play for a second time." *Aro Mfg. Co.* v. *Convertible Top Replacement Co.*, 365 U. S. 336, 346 (1961). That is because the patent holder has "received his reward" only for the actual article sold, and not for subsequent recreations of it. *Univis*, 316 U. S., at 251. If the purchaser of that article could make and sell endless copies, the patent would effectively protect the invention for just a single sale. Bowman himself disputes none of this analysis as a general matter: He forthrightly acknowledges the "well settled" principle "that the exhaustion doctrine does not extend to the right to 'make' a new product." Brief for Petitioner 37 (citing *Aro*, 365 U. S., at 346).

Unfortunately for Bowman, that principle decides this case against him. Under the patent exhaustion doctrine, Bowman could resell the patented soybeans he purchased from the grain elevator; so too he could consume the beans himself or feed them to his animals. Monsanto, although the patent holder, would have no business interfering in those uses of Roundup Ready beans. But the exhaustion doctrine does not enable Bowman to make *additional* patented soybeans without Monsanto's permission (either express or implied). And that is precisely what Bowman did. He took the soybeans he purchased home; planted them in his fields at the time he thought best; applied glyphosate to kill weeds (as well as any soy plants lacking

the Roundup Ready trait); and finally harvested more (many more) beans than he started with. That is how "to 'make' a new product," to use Bowman's words, when the original product is a seed. Brief for Petitioner 37; see Webster's Third New International Dictionary 1363 (1961) ("make" means "cause to exist, occur, or appear," or more specifically, "plant and raise (a crop)"). Because Bowman thus reproduced Monsanto's patented invention, the exhaustion doctrine does not protect him.[3]

Were the matter otherwise, Monsanto's patent would provide scant benefit. After inventing the Roundup Ready trait, Monsanto would, to be sure, "receiv[e] [its] reward" for the first seeds it sells. *Univis,* 316 U. S., at 251. But in short order, other seed companies could reproduce the product and market it to growers, thus depriving Monsanto of its monopoly. And farmers themselves need only buy the seed once, whether from Monsanto, a competitor, or (as here) a grain elevator. The grower could multiply his initial purchase, and then multiply that new creation, *ad infinitum*—each time profiting from the patented seed without compensating its inventor. Bowman's late-season plantings offer a prime illustration. After buying beans for a single harvest, Bowman saved enough seed each year to reduce or eliminate the need for additional purchases.

---

[3] This conclusion applies however Bowman acquired Roundup Ready seed: The doctrine of patent exhaustion no more protected Bowman's reproduction of the seed he purchased for his first crop (from a Monsanto-affiliated seed company) than the beans he bought for his second (from a grain elevator). The difference between the two purchases was that the first—but not the second—came with a license from Monsanto to plant the seed and then harvest and market one crop of beans. We do not here confront a case in which Monsanto (or an affiliated seed company) sold Roundup Ready to a farmer without an express license agreement. For reasons we explain below, we think that case unlikely to arise. See *infra,* at 9. And in the event it did, the farmer might reasonably claim that the sale came with an implied license to plant and harvest one soybean crop.

Monsanto still held its patent, but received no gain from Bowman's annual production and sale of Roundup Ready soybeans. The exhaustion doctrine is limited to the "particular item" sold to avoid just such a mismatch between invention and reward.

Our holding today also follows from *J. E. M. Ag Supply, Inc.* v. *Pioneer Hi-Bred Int'l, Inc.*, 534 U. S. 124 (2001). We considered there whether an inventor could get a patent on a seed or plant, or only a certificate issued under the Plant Variety Protection Act (PVPA), 7 U. S. C. §2321 *et seq.* We decided a patent was available, rejecting the claim that the PVPA implicitly repealed the Patent Act's coverage of seeds and plants. On our view, the two statutes established different, but not conflicting schemes: The requirements for getting a patent "are more stringent than those for obtaining a PVP certificate, and the protections afforded" by a patent are correspondingly greater. *J. E. M.*, 534 U. S., at 142. Most notable here, we explained that only a patent holder (not a certificate holder) could prohibit "[a] farmer who legally purchases and plants" a protected seed from saving harvested seed "for replanting." *Id.*, at 140; see *id.*, at 143 (noting that the Patent Act, unlike the PVPA, contains "no exemptio[n]" for "saving seed"). That statement is inconsistent with applying exhaustion to protect conduct like Bowman's. If a sale cut off the right to control a patented seed's progeny, then (contrary to *J. E. M.*) the patentee could *not* prevent the buyer from saving harvested seed. Indeed, the patentee could not stop the buyer from *selling* such seed, which even a PVP certificate owner (who, recall, is supposed to have fewer rights) can usually accomplish. See 7 U. S. C. §§2541, 2543. Those limitations would turn upside-down the statutory scheme *J. E. M.* described.

Bowman principally argues that exhaustion should apply here because seeds are meant to be planted. The exhaustion doctrine, he reminds us, typically prevents a

patentee from controlling the use of a patented product
following an authorized sale. And in planting Roundup
Ready seeds, Bowman continues, he is merely using them
in the normal way farmers do. Bowman thus concludes
that allowing Monsanto to interfere with that use would
"creat[e] an impermissible exception to the exhaustion
doctrine" for patented seeds and other "self-replicating
technologies." Brief for Petitioner 16.

But it is really Bowman who is asking for an unprece-
dented exception—to what he concedes is the "well settled"
rule that "the exhaustion doctrine does not extend to the
right to 'make' a new product." See *supra,* at 5. Reproduc-
ing a patented article no doubt "uses" it after a fashion.
But as already explained, we have always drawn the
boundaries of the exhaustion doctrine to exclude that
activity, so that the patentee retains an undiminished
right to prohibit others from making the thing his patent
protects. See, *e.g., Cotton-Tie Co.* v. *Simmons*, 106 U. S.
89, 93–94 (1882) (holding that a purchaser could not "use"
the buckle from a patented cotton-bale tie to "make" a new
tie). That is because, once again, if simple copying were a
protected use, a patent would plummet in value after the
first sale of the first item containing the invention. The
undiluted patent monopoly, it might be said, would extend
not for 20 years (as the Patent Act promises), but for only
one transaction. And that would result in less incentive
for innovation than Congress wanted. Hence our repeated
insistence that exhaustion applies only to the particular
item sold, and not to reproductions.

Nor do we think that rule will prevent farmers from
making appropriate use of the Roundup Ready seed they
buy. Bowman himself stands in a peculiarly poor position
to assert such a claim. As noted earlier, the commodity
soybeans he purchased were intended not for planting, but
for consumption. See *supra,* at 2–3. Indeed, Bowman
conceded in deposition testimony that he knew of no other

farmer who employed beans bought from a grain elevator to grow a new crop. See App. 84a. So a non-replicating use of the commodity beans at issue here was not just available, but standard fare. And in the more ordinary case, when a farmer purchases Roundup Ready seed *qua* seed—that is, seed intended to grow a crop—he will be able to plant it. Monsanto, to be sure, conditions the farmer's ability to reproduce Roundup Ready; but it does not—could not realistically—preclude all planting. No sane farmer, after all, would buy the product without some ability to grow soybeans from it. And so Monsanto, predictably enough, sells Roundup Ready seed to farmers with a license to use it to make a crop. See *supra,* at 2, 6, n. 3. Applying our usual rule in this context therefore will allow farmers to benefit from Roundup Ready, even as it rewards Monsanto for its innovation.

Still, Bowman has another seeds-are-special argument: that soybeans naturally "self-replicate or 'sprout' unless stored in a controlled manner," and thus "it was the planted soybean, not Bowman" himself, that made replicas of Monsanto's patented invention. Brief for Petitioner 42; see Tr. of Oral Arg. 14 ("[F]armers, when they plant seeds, they don't exercise any control . . . over their crop" or "over the creative process"). But we think that blame-the-bean defense tough to credit. Bowman was not a passive observer of his soybeans' multiplication; or put another way, the seeds he purchased (miraculous though they might be in other respects) did not spontaneously create eight successive soybean crops. As we have explained, *supra* at 2–3, Bowman devised and executed a novel way to harvest crops from Roundup Ready seeds without paying the usual premium. He purchased beans from a grain elevator anticipating that many would be Roundup Ready; applied a glyphosate-based herbicide in a way that culled any plants without the patented trait; and saved beans from the rest for the next season. He then planted those

Roundup Ready beans at a chosen time; tended and treated them, including by exploiting their patented glyphosate-resistance; and harvested many more seeds, which he either marketed or saved to begin the next cycle.  In all this, the bean surely figured.  But it was Bowman, and not the bean, who controlled the reproduction (unto the eighth generation) of Monsanto's patented invention.

Our holding today is limited—addressing the situation before us, rather than every one involving a self-replicating product.  We recognize that such inventions are becoming ever more prevalent, complex, and diverse.  In another case, the article's self-replication might occur outside the purchaser's control.  Or it might be a necessary but incidental step in using the item for another purpose.  Cf. 17 U. S. C. §117(a)(1) ("[I]t is not [a copyright] in-fringement for the owner of a copy of a computer program to make . . . another copy or adaptation of that computer program provide[d] that such a new copy or adaptation is created as an essential step in the utilization of the com-puter program").  We need not address here whether or how the doctrine of patent exhaustion would apply in such circumstances.  In the case at hand, Bowman planted Monsanto's patented soybeans solely to make and market replicas of them, thus depriving the company of the re-ward patent law provides for the sale of each article.  Patent exhaustion provides no haven for that conduct.  We accordingly affirm the judgment of the Court of Appeals for the Federal Circuit.

*It is so ordered.*