REYNA, Circuit Judge,
dissenting.
• The majority holds that LifeScan’s sale (or promotional giveaway) of its unpatent-ed blood glucose meter[1] exhausts its rights in a patented method, which requires a specialized test strip that is consumed in practicing the method, because the meter “controls and carries out” the functions described in the patent and Li-feScan failed to obtain a patent for the test strip. The majority reaches its result by conflating the patentability of a product with the product’s ability to substantially embody the essential features of a patented method. The majority, reasons that because LifeScan did not obtain a patent on its test strips, those strips could not substantially embody the essential features of its method patent. Yet, the Supreme Court has recognized that it makes “no difference as to the infringement or non-infringement of a combination that one of its elements or all of its elements are *1378 unpatented.” Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 375, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) (Harlan, J., dissenting) (quoting Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 325, 333, 29 S.Ct. 503, 53 L.Ed. 816 (1909)). The Court’s recent pronouncement in the context of method patent exhaustion makes Justice Harlan’s observation in Aro no less applicable today. See Quanta Computer, Inc. v. LG Elecs., Inc., 553 U.S. 617, 632, 128 S.Ct. 2109, 170 L.Ed.2d 996 (2008). I disagree with the patentability gloss that the majority casts on the otherwise straightforward exhaustion standard expressed in Quanta. Accordingly, I respectfully dissent.
I.
The Supreme Court has held that the sale of a product triggers exhaustion when its only reasonable and intended use is to practice the patent and it substantially embodies the essential features of the patented invention. Quanta, 553 U.S. at 631, 128 S.Ct. 2109 (quoting United States v. Univis Lens Co., 316 U.S. 241, 249-51, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942)). There is no real dispute in this case that the only reasonable and intended use of LifeScan’s blood glucose meter is to practice the patent-in-suit. See Maj. Op. at 1368-69. Therefore, this case turns on the question of whether' LifeScan’s meters or its test strips substantially embody the essential features of the patent. I conclude that the test strips, and not the meters, embody those essential features.
The majority apparently misapprehends the Court’s guidance in Quanta, which causes it to incorrectly conclude that the meters, and not the test strips, embody the essential features of LifeScan’s patented method. In Quanta, the Supreme Court explained that a product embodies the essential features of a method patent when the product contains or is involved in the inventive, as opposed to the standard, processes of the patented method. Quanta, 553 U.S. at 633, 128 S.Ct. 2109 C‘[T]he grinding process [in Univis ] was not central to the patents. That standard process was not included in detail in any of the patents and was not referred to at all in two of the patents.”). The Court did not clearly demarcate a line between inventive and standard processes, but its analysis of the facts of that case is informative. In particular, the microprocessor and chipset, which “eonstitute[d] a material part of the patented invention and all but completely practice[d] the patent,” substantially embodied the inventive processes of the method patent at issue because “the only step necessary to practice the patent [wa]s the application of common processes or the addition of standard parts.” Id. (emphasis added). The addition of those standard components, memory and buses, was common and noninventive, and doing so required no creative or inventive decision on the part of the accused infringer. Id. at 633-34, 128 S.Ct. 2109. The Court emphasized that it is the nature of the steps that is the relevant characteristic, rather than the patentability of the components themselves. Id. at 635, 128 S.Ct. 2109 (“While each ... microprocessor and chip-set practices thousands of individual patents, including some [patents] not at issue in this case, the exhaustion analysis is not altered by the fact that more than one patent is practiced by the same product.”). The Court’s analysis makes clear that the inventive contributions of the components to the method, as opposed to the inventiveness of the components themselves, determine their essentialness. The majority’s apparent misunderstanding of the Court’s guidance in Quanta causes it to err in two separate respects.
A.
First, the majority relies on Quanta to elevate the blood glucose meter over the *1379 test strip as the essential feature of the patented method. Because of the majority’s belief that LifeScan’s blood glucose meters “control and carry out” the functions described in the patents, it reasons that the meters alone embody the essential features of the method patent. While the majority correctly identifies the objective of LifeScan’s inventive method, reducing errors in blood glucose readings caused by insufficient sample liquid and defects in the production of test strips, it incorrectly concludes that the “measuring,” “comparing,” and “giving an indication of an error” steps performed by the meter are essential to achieving the stated objective.
Prior art blood glucose meters relied on a test strip with only two electrodes — one reference and one working. U.S. Patent No. 7,250,105 col. 1 ll. 27-29 (filed May 7, 2003) (“the '105 patent”). When the enzyme coating the working electrode reacted with glucose in the blood sample, it would release electrons that would result in an electrical current, which could be measured relative to the reference electrode. In contrast, the test strip utilized by the patented method in this ease has three electrodes, two of which are working and capable of measuring an electrical current. This distinction is crucial. When the working electrode in a prior art meter would become severed because of a manufacturing defect or was insufficiently covered with blood due to an operator error, the patient woúld have no way of knowing that the reading was erroneous. See id. col. 2 ll. 27-38. Once LifeScan developed its patented method that used two working electrodes, the meter could measure two separate blood glucose readings. Id. As a result, a difference in the readings would indicate an error condition — either insufficient blood covering one of the electrodes or a defective electrode — and the patient could be alerted accordingly. But for the specialized test strips required by LifeS-can’s patented method, the blood glucose meter alone could not perform the “comparing” and “giving an indication of an error” steps viewed by the majority as essential to the patented method.[2] Accordingly, LifeScan’s test strips substantially embody the essential features of its patented method.
In contrast, the blood glucose meter cannot be fairly viewed ’as embodying the essential features of LifeScan’s patented method. The steps performed by the meter, “measuring,” “comparing,” and “giving an indication of an error,” are only made possible by the unique configuration of the three electrode test strip, as explained above. A diabetic patient with a LifeScan test strip, a pencil, a pad of paper, and an ammeter (a device used to measure electric current) could “measure an electric current at each working sensor part,” “compare the electric current from each working sensor parts to establish a difference parameter,” and “give an indication of an error if ..said difference parameter is greater than a predetermined threshold,” all without the assistance of a blood glucose meter. See Gottschalk v. Benson, 409 U.S. 63, 65, 93 S.Ct. 253, 34 L.Ed.2d 273 *1380 (1972) (“A digital computer ... operates on data expressed in digits, solving a problem by doing arithmetic as a person would do it by h$gd and hand”)- Accordingly, LifeScan’s blood glucose meter does not embody the essential features of its patented method because the steps it performs are common and noninventive. In fact, the meter is more fairly characterized as a standard component in the system and only involves the application of common processes. See Quanta, 553 U.S. at 633, 128 S.Ct. 2109.
B.
Second, the majority misinterprets Quanta by requiring that the “essential, or inventive, features” of a method patent be contained in a separately-patentable component covered by a product patent. Because LifeScan abandoned its patent applications covering its test strip, the majority concludes that the strip cannot embody the essential features of LifeScan’s method patent. This reasoning is inconsistent with the Supreme Court’s guidance in Quanta. In that case, the Court focused on the inventiveness of the steps in the claimed method, rather than the patenta-bility of the underlying components themselves. Quanta, 553 U.S. at 635, 128 S.Ct. 2109. The Court’s analysis, as opposed to the majority’s reinterpretation of it, is fully consistent with the statute. Section 100(b) of the Patent Act explicitly provides that an entity like LifeScan can obtain a patent for its method that “includes a new use of a known ... machine.” 35 U.S.C. § 100(b). Accordingly, the majority was incorrect to place any significance on the patentability of LifeScan’s test strip. What matters is whether the test strip embodies the steps that are essential to the patented method. As noted above, LifeScan’s test strips are essential to the patented method.[3]
The majority relies on this court’s recent decision in Keurig, Inc., v. Sturm, Foods, Inc., No. 13-1072, 732 F.3d 1370, 2013 WL 5645192 (Fed.Cir.2013), which held that the sale of a coffee brewer exhausts the patentee’s rights in a method covering the use of the brewer with a disposable cartridge. But that case is distinguishable from this case. Unlike this case where the inventiveness of the method lies in the test strip, every step of the claimed method in Keurig is performed by the brewer with the cartridge merely serving as a passive participant. Id. at 2-3, 732 F.3d at 1372-74. Tellingly, the panel in Keurig focused on whether the brewers had substantial noninfringing uses (which is not at issue here) rather than whether it embodied the essential features of the patented method (which is at issue here). Furthermore, both the brewer and the cartridge are separately patented (by apparatus patents), yet the majority in this case does not explain the effect this has on which component embodies the essential features of the method patent.
Assuming that the patentability of the test strips in this case was relevant to exhaustion and determined whether that component could embody the essential features of a patented method, since LifeS-can’s blood glucose meter is not patented, it too would not exhaust the method patent. In brief, while the majority devotes significant attention to the patentability of the test strip, it fails to demonstrate that LifeScan’s meter is separately patentable. The evidence suggests that it is not. See *1381 supra note 1. By assuming that the meter was patentable by finding it essential to the patented method in this case, the majority, in effect, allows LifeScan to sue competitors that employ any blood glucose reader that measures electric currents, compares the electric currents, and give an error indication if they differ. This ove-rextension of the patent grant violates the principles of every exhaustion and combination case decided by this court and the Supreme Court. See, e.g., Quanta, 553 U.S. at 626, 128 S.Ct. 2109. Had the majority properly focused on the inventiveness of the method steps rather than the patentability of the underlying components themselves, this misstep would have been avoided. For the reasons given, the majority’s decision to make inventiveness for exhaustion purposes coextensive with pat-entability, see Maj. Op. at 1369-70, cannot be squared with Supreme Court precedent.[4]
II.
Applying exhaustion to a case such as this one is especially inappropriate because the essential features of the patented method are embodied in test strips that are immediately consumed during performance of the method even though Li-feScan has received little to nothing in return for its blood glucose meters. Despite that, the majority concludes that patent exhaustion applies to the meters that LifeScan sells at below cost without test strips and that cannot practice the patented method right out of the box, see supra note 3, as well as the promotional meters that LifeScan distributes for free as part of a Starter Kit. The majority reasons that LifeScan has “received [its] reward” for its patented method even on the meters it gives away for free because it retained the “hope of obtaining a future benefit” on those meters. Maj. Op. at 1375 (citing Univis, 316 U.S. at 251, 62 S.Ct. 1088). What benefit that is remains a mystery. Once a patient’s use of the meter consumes the ten free strips included in Li-feScan’s Starter Kit,[5] the patient will be able to practice the method with impunity using Shasta’s generic test strips that are designed to mimic LifeScan’s OneToueh® Ultra® strip. In such instances, LifeScan will not receive any cognizable reward from the meters it distributes for free and, hence, any purported “future benefit” is speculative and entirely theoretical.
“The declared purpose of the patent law is to promote the progress of science and the useful arts by granting to the inventor a limited monopoly, the exercise of which will enable him to secure the financial rewards for his invention.” Univis, 316 U.S. at 250, 62 S.Ct. 1088 (citing U.S. Const. art. I, § 8, cl. 8). A patent system premised on granting the patentee a “hope of receiving a future benefit” is one where *1382 there is no secure benefit to be had and that does not promote the progress of the useful arts. The majority’s reasoning is particularly problematic in this context where a method patent is involved. For method patent claims, infringement occurs when a party performs all of the steps of the claimed method. Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 773 (Fed.Cir.1993); see also Mirror Worlds, LLC v. Apple Inc., 692 F.3d 1351, 1359 (Fed.Cir.2012) (“Direct infringement of a method claim can be based on even one instance of the claimed method being performed.”). Accordingly, each time an individual practices a patented method, the individual infringes the patent. Beedle v. Bennett, 122 U.S. 71, 78, 7 S.Ct. 1090, 30 L.Ed. 1074 (1887). (“The patent covers the process of drawing water from the earth by means of a well driven in the manner described in the patent. The use of a well so constructed is, therefore, a continuing infringement, as every time water is drawn from it the patented process is necessarily used.”); see also Bowman v. Monsanto Co., — U.S.-, 133 S.Ct. 1761, 1766, 185 L.Ed.2d 931 (2013) (“Rather, ‘a second creation’ of the patented item ‘call[s] the monopoly, conferred by the patent grant, into play for a second time.’ ” (quoting Aro, 365 U.S. at 346, 81 S.Ct. 599) (alteration in original)). In a case such as this one where the essential component is consumed in the patented process, it is inappropriate to limit that patentee to a single reward for the sale or giveaway of the first component. See id. (“[T]he patent holder has ‘received his reward’ only for the article sold, and not for subsequent recreations of it.” (quoting Univis, 316 U.S. at 251, 62 S.Ct. 1088)). Each successive performance of the method would be an infringement unless licensed by the patentee, either explicitly or implicitly. On the facts of this case, the only means for a patient to obtain a license for subsequent performances of Li-feScan’s patented method would be through purchasing additional LifeScan’s OneTouch® Ultra® test strips, but based on the majority’s conclusion, the fact that no license flows from the purchase of Shasta’s generic test strips is rendered meaningless because use of those strips are held not to be infringing. Accordingly, exhaustion should not apply in a case such as this one where the essential features of a patented method are embodied in a component that is immediately consumed during performance of the method. This is true whether the initial component is given away for free, sold under cost, or sold at a premium.
Although the contexts are different, the Supreme Court’s reasoning in its recent decision in Bowman does not support the majority’s conclusion that exhaustion applies to method patents the practice of which consume its essential component.[6] In Bowman, the Court refused to find Monsanto’s patent rights exhausted when Mr. Bowman purchased seeds from a grain elevator even though those seeds were grown from patented seeds Monsanto had sold to other farmers. While Monsanto received its reward for the first seeds it sold, the Court reasoned that the other seed companies (i.e., Monsanto’s competitors) would reproduce the seeds themselves and sell them to farmers who would *1383 only need to buy them once and reproduce them for future plantings. Id. at 1767. Monsanto would be deprived of its exclusive rights in all of these subsequent sales and reproductions of its patented seeds. Id. Accordingly, the Court held that “[t]he exhaustion doctrine is limited to the ‘particular item’ sold to avoid just such a mismatch between invention and reward.” Id. A contrary holding would have caused the patent to “plummet in value after the first sale of the first item containing the invention,” and the patentee’s exclusive rights would last only one transaction. Id. at 1768.
The majority’s holding in this case will unquestionably cause LifeScan’s patented method to plummet in value and result in its exclusive rights over the method lasting only one transaction. Similar to Bowman,after patients consume the ten test strips in the Starter Kit, or none, they will be able to continue practicing LifeScan’s patented method using generic test strips supplied by LifeScan’s competitors. Yet the mismatch between invention and reward in this case is even starker than it was in Bowman. While Monsanto received a reward for the first set of seeds it sold, LifeScan receives no reward whatsoever on the Starter Kit. Additionally, Li-feScan will be deprived of its exclusive rights in all of the subsequent performances of its patented method after the giveaway sample test strips are consumed. Because LifeScan’s test strips embody the essential features of its patented method, the majority erred by finding exhaustion applied once the meter is sold (or given away). Accordingly, I respectfully dissent.

. On its packaging and promotional materials, LifeScan's OneTouch® Ultra® blood glucose meters and test strips list a number of patents embodied in the combination, but the only patent applicable to the meter is a. design patent, U.S. Patent No. D546,216 (filed Jul. 11, 2005), which is inapplicable to this case.

. The majority understands the examiner’s statement of his reasons for allowance to be that he allowed the method claims as distinguishable from the prior art because they contained the “measuring,” “comparing,” and “giving an indication of an error” steps. Maj. Op. at 1370-71. In fact, the examiner was commenting on the patentability of LifeS-can’s product claim, rather than distinguishing LifeScan’s method claim from other prior art methods. Accordingly, his statement gives no indication either way which steps are essential to the patented method. In any event, "[t]his court has recognized that an Examiner’s Statement of Reasons for Allowance 'will not necessarily limit a claim.' " Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1345 (Fed.Cir.2005) (quoting ACCO Brands, Inc. v. Micro Sec. Devices, Inc., 346 F.3d 1075, 1079 (Fed.Cir.2003)).

. LifeScan sells 40% of its blood glucose meters below cost, but without test strips. The essentialness of the test strips is made evident by the fact that a patient could not practice the steps of LifeScan’s patented method with the meter alone because every step except the last requires a “measuring device” (i.e., a test strip) or a “working sensor part” (i.e., an electrode) on the measuring device. See '105 Patent col. 6 1. 55 to col. 8 1. 4.

. The majority asserts that this formulation of its holding is "demonstrably inaccurate.” Maj. Op. at 1371 n. 5. I agree that this formulation of its holding is itself a misstatement of the law and inconsistent with Quanta, which is why I am perplexed that the majority would hold that "[wjhat is 'inventive' about patent claims in the patent exhaustion context is what distinguishes them from the prior art,” i.e., makes them patentable. See id. at 1369. Perhaps the majority means “what is ‘inventive’ about method patent claims in the patent exhaustion context is which claim steps distinguish this method claim from other prior art method claims." I would agree to this formulation, but do not ascribe it to the majority because it is inconsistent with that majority's persistent focus on the patentability of the strips themselves.

. It is immaterial that LifeScan distributes the first ten test strips for free because it intends for the patient to use those strips to perform its patented method. I do not understand LifeScan to argue to the contrary. Rather, LifeScan insists that its patent rights are not exhausted with respect to additional strips that a patient combines with the meter after the initial ten strips have been consumed.

. The principle case involving consumables on which the majority relies, Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U.S. 425, 14 S.Ct. 627, 38 L.Ed. 500 (1894), is inapposite. Unlike this case that involves a method patent, which is infringed every time the method is practiced, that case dealt with an apparatus patent covering the combination of a roll of toilet paper and a dispenser. See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1311 (Fed.Cir.2005) ("[A] rule that governs infringement of a method claim may not always govern infringement of an apparatus claim.”).